(105 So. 562)

**STATE ex rel. DAVIS v. MEAHER et al.**
( I Div. 364.)

(Supreme Court of Alabama. June 25, 1925. Rehearing Denied July 24, 1925.)

I. Dedication ⊂⊃19(5)—Sale of land by reference to map held not to establish dedication of streets and water front in accordance with earlier map including more territory.

Where map, drawn in 1835, contained inscription "plan of a part of the Orange Grove tract reduced from the original map," and in another place "surveyed by Dean Knox," *held*, a sale of lots by reference to such map did not establish dedication of streets and strip along water front shown on "original map" referred to in inscription which had been drawn by Dean Knox, though it was apparent that map on which sales were based was but reproduction of portion of Knox's Map, where lots so sold were some distance from portion of tract in controversy.

---

**2. Deeds** ☞40—**Evidence** ☞390(3)—**When plan with reference to which deed is made becomes part of deed stated.**

It is only when a grant is made according to a plan distinctly and certainly designated by deed that plan becomes a part of deed, and, in such case, plan is subject to no other explanations than other parts of deed.

**3. Dedication** ☞12, 41—**Dedication can be made only by owner; party asserting dedication has burden of proving it, including ownership of dedicator.**

Dedication can be made only by owner, and burden of proving dedication, including ownership of dedicator, rests on party asserting it.

**4. Dedication** ☞19(5)—**Mere act of mapping, planning, and selling, not followed by conveyances or public use of land, will not establish dedication in accordance with map.**

Mere act of mapping, planning, and selling lots by reference to map, not followed by conveyances or public use of land, will not establish dedication of streets in accordance with map.

**5. Dedication** ☞19(5)—**Decree for sale of lots held not to establish dedication of street pursuant to plat by which lots in other tract were sold.**

Reference, in chancery decree for sale of lots, to plan adopted at other sales many years before of lots in tract of much less extent than that covered by decree *held* not to be construed as establishing dedication of street along water front, there being nothing to show that former sales were made according to plat, including lots later sold, and any such construction resulting in determination of question outside issues.

**6. Dedication** ☞19(5)—**Judicial sale of lots by reference to map held not to establish dedication of strip along water front shown on earlier map.**

Judicial sale of various lots in tract by reference to particular map, designating "a plan of a part of Orange Grove," *held* not to establish a dedication of streets and strip along water front in accordance with earlier map, showing more territory, particularly in view of fact that conveyances of lots sold along water front named water front as boundary without reservation.

**7. Dedication** ☞19(2)—**Explicit designation of street not necessary to dedication to public, though reference in conveyance to streets shown by map, if for description only, establishes no dedication.**

Explicit designation of streets on map is not necessary to show dedication to public, intent to dedicate being inferred from relative location of blank spaces and lots or blocks, though, if reference in conveyance of streets or alleys shown by map or plan is for purpose of description only, there is no dedication.

**8. Dedication** ☞19(2)—**As relates to dedication, there is essential difference between "wharves" and other public places; "wharf."**

As relates to dedication, there is an essential difference between wharves and other public places, and delineation of wharf and name on map have no effect in determining its character as public or private, essential requisite of a "wharf" being an artificial construction which facilitates the landing, loading, and unloading of vessels for water carriage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Wharf.]

**9. Deeds** ☞112(2)—**Map referred to is part of deed, construed as writing in general and most favorably to public in cases involving dedication.**

When deed refers to plan or map, the plan or map becomes part thereof, and is to be construed as writings in general are construed, all marks and lines if possible being given effect, and ambiguities within reasonable limits construed in favor of public in cases involving dedication to public.

**10. Dedication** ☞41—**Not presumed.**

Dedication to public is not presumed, and intent of owner must be fairly discernible from his acts, which, if they are equivocal, are insufficient to establish a dedication.

**11. Dedication** ☞44—**Nonaccess from neighboring streets to water front lots held not conclusive of dedication.**

That some lots along water front would be without access from neighboring streets if there was no dedication of street along water front *held* not conclusive of dedication according to old plan or map, where conveyances described lots as extending to channel, and each had access to tidewater highway.

**12. Boundaries** ☞3(3)—**Monuments, whether natural or artificial, dominate courses and distances.**

Monuments, whether natural or artificial, as a rule dominate courses and distances.

**13. Dedication** ☞19(5)—**Judicial sale of lot remote from water front by reference to map held not evidence of dedication of strip along water front.**

Judicial sale of numerous separate lots, which took effect at one time, on approval by one decree, *held* such as should be construed as a single proceeding, though sales continued through four days, and fact that first lot sold remote from water front, was sold by reference to map showing open strip along water front, not evidence of dedication of that strip to public contrary to later sales of lots fronting on water.

**14. Dedication** ☞19(5)—**Conveyances to water front held not construable as subject to easement in public claiming dedication of such strip.**

Conveyances of lots along water front, pursuant to judicial sale, which purported to grant title to water's edge, *held* not construable as being made subject to easement of public in strip along water front, dedication of which was sought to be established.

**15. Deeds** ☞90—**Deeds must be construed most favorably to grantee.**

Deeds must be construed most favorably to grantee.

**16. Dedication** ☞43—**Municipal acquiescence in private use of property may be considered on question whether there was ever intent to dedicate or acceptance by public.**

Though municipal authorities' acquiescence for 60 or 70 years in private use of strip of land along water front, dedication of which to pub-

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

lic was sought to be established, is not competent evidence of reversion to dedicator, it may properly be considered with other circumstances in determining whether there was ever an intent 'to dedicate and an acceptance by public.

**17. Dedication ☞39—Users of land held not estopped to assert government's ownership of land at time of alleged dedication.**

Defendants, using strip of land along water front, and denying dedication thereof to public, who claimed under decree which purported to pass title to all of territory involved, *held* not estopped to assert that, at time of entry of such decree and at time of alleged dedication, title to part of land was in the United States and not subject to dedication.

**18. Dedication ☞39—Party to conveyance by reference to map showing streets estopped to deny dedication, in absence of express qualification. ·**

Owner who is party to conveyance by reference to plan of streets shown by map is estopped to deny dedication of such streets, in absence of ·express qualification.

Gardner and Thomas, JJ., dissenting.

Appeal from Circuit Court, Mobile County; Ben D. Turner, Judge.

Bill in equity by the state of Alabama, on the relation of Harwell G. Davis, as Attorney General, and by Harwell G. Davis, Attorney General, in his official capacity, against Augustine Meaher, the Alabama Corn Mills, the Hallett Manufacturing Company and Taylor, Lowenstein & Co. From the decree, complainant appeals. Affirmed.

The bill alleges that the owners of the Orange Grove tract, a body of land situated in the city of Mobile and on One Mile creek or Bayou Marmotte, in 1835 or 1836, subdivided the same for the purpose of sale, and that Dean Knox, a deputy surveyor of the United States, under the direction of the proprietors made a platting, dividing the tract into numbered blocks and lots, and providing thereon for named streets and public ways, "as shown by a copy of the copy of the original of first platting map of said area about the year 1835"—exhibited with the bill—"the said copy being made with his indorsement thereon and attested by said Knox in the year 1844, and then placed on record" in the office of the probate judge of Mobile county.

It is further alleged that about the year 1835 the proprietors of Orange Grove tract sold some of the lots or blocks to purchasers; that such sales were made with reference to the Dexter Map, made during the year 1835, recorded in the office of the probate judge, and bearing the indorsement shown by the opinion; and that said sales being made with reference to the Dexter Map, containing such indorsement, were made with reference to the Knox Map. It is alleged that about 1858 P. J. Pillans, city surveyor of Mobile, made a map of the unsold part of Orange Grove tract substantially a copy, from Hunt Street North of Knox Map, except for the area condemned by the Mobile & Ohio Railroad Company; that this map was filed for record in the Mobile chancery court, and a copy also filed therein in a book entitled "Orange Grove Tract, Sold at Public Auction April 18–21, 1859;" and that sales of lots or blocks shown on said Pillan's Map in 1859 were made with express reference thereto. It is averred that the easements in the streets or ·public ways described in the bill were dedicated' to the public use in and by the platting and sales made in 1835 or 1836, and by the platting and sales according to the Pillans Map, through and by a decree, and trustees executing it of the chancery court of Mobile county in the case styled Adams, Smith et al. v. McCoy.

It is averred that the area or· easement therein dedicated to public use by the proprietors was· a strip 60 by 1930 feet lying along the south and west bank of One Mile creek, particularly described in the bill; designated Marmotte wharf on the Knox Map, and shown but not so designated on the Pillans Map, and shown as a public space or way on the Louis Troost Maps of that part of the city of Mobile; and that Orange, Earle, Poe (Manassas), Knox, Marion, Morgan, and Water streets, designated òn the Knox and Pillans Maps, were dedicated to the public use either in 1835 or 1859, except as to the segments thereof condemned by the Mobile & Ohio Railroad Company.

It is averred that the defendants are creating or maintaining public ways in question, in that they have placed or are maintaining obstructions or impediments therein, interfering with the public use thereof.

· Defendants, by their answer, set up that the Orange Grove tract was, in the early 30's, granted by the government, in two tracts known as the Forbes grant and the Laurent plantation, to John Forbes & Co.; that in the early part of 1835 and prior thereto both tracts were owned by John Bloodgood and others who, about the month of ,May of that year, quitclaimed both of said tracts, together with an additional area to which the grantors had no right or title to convey, to James McGee, and others as trustees.

It is admitted that the Knox Map is of record, and that it was made at the instance of either the grantors or grantees in the quitclaim deed, but it is denied that the parties who caused said map to be made authorized or procured the recording thereof.

It is further asserted by the answer that, after the drawing and recording of the Dexter Map in 1835 or 1836, the trustees created by the quitclaim deed sold nearly all of the property shown by such map, and that all sales made by the trustees in 1835 and 1836 of any area shown on the Dexter Map were made with reference to the Dexter Map and ı one other; that up to May 4, 1857, no part of the Forbes grant and Laurent plantation

north of Hunt street had been sold, and that on said date the cestuis que trust filed their bill in chancery against the trustees, resulting in the decree rendered June 25, 1857; that on April 18, 19, 20, and 21, 1859, the trustees appointed by the decree sold, or purported to sell, at public outcry, a large portion of the then unsold or uncondemned lands platted on the Pillans Map, embracing all of the parcels fronting or bordering on Bayou Marmotte throughout the distance covered by the space on the Knox Map marked Marmotte wharf, each purported sale extending to said bayou or its channel and embracing a part of the area indicated on the Knox Map as Marmotte wharf; that the transaction was a single sale extending from day to day over the 4-day period; that deeds were made to the several purchasers and described the parcels situated next to Bayou Marmotte as being bounded on that side either by the bayou or its channel, and that each deed referred to the Pillans Map; that said Pillans Map departs in several particulars from the Knox Map, and was made for the use of the trustees in selling said property.

It is denied that anything occurred to effect a dedication prior to the sales by the trustees and that or thereafter; and it is asserted that the Knox Map could not effect a dedication of the strip, for that it indicated no purpose to dedicate to the public, and that no deed was ever made with reference to such map or anything done to give it a dedicatory effect. It is further asserted that, while by the Pillans Map and deeds with reference to it certain streets were dedicated to the public, in so far as they are situated in the Forbes grant and Laurent plantation such dedications are not now effective except as to Commerce street, for that such streets have been abandoned, and that there is no public street within the area bounded on the south by lands condemned by the Mobile & Ohio Railroad Company, on the west by Orange street, and on the north and east by Bayou Marmotte and Mobile river, and that the city of Mobile has never opened up or cared for any street in the area; that, as appears from the Pillans Map, all of the streets in said area except Orange street are short segments or ends of streets entirely blocked at both ends and incapable of being made serviceable as highways; that all of the area north of Orange street belongs either to the parties to this case or to the railroad company, and has been used for many years as railroad yards or for plants, structures, or businesses of some kind on the water front.

The agreement of the parties is as follows:

"Without admission by either party that any fact hereinafter stated is material, relevant, or competent, the parties to said cause do hereby agree that the following statements are true, and may be used as evidence in the above stated cause in so far as the same may be material, relevant, and competent:

"(1) The physical arrangement of that part of Deed Book No. 9, O. S., in the office of the judge of probate of Mobile county, Ala., hereinafter mentioned is as follows: The said volume is of the ordinary size used for deed records. The record of the deed from G. Huggins, sheriff, Mobile county, and tax collector, to James G. Lyon, a certified copy of which has been introduced in evidence by the complainant begins about six inches below the top of page 128 of said record and occupies the remainder of that page and about four inches of the top of page 129. Immediately following the record of the deed last mentioned is the record of the deed from Robert Broadnax to John and William Huddleston, a certified copy of which has been introduced in evidence by the complainant, and the record of the last mentioned deed occupies and consumes the remainder of said page 129 of said Deed Book. Pages 130 and 131 of said Deed Book face each other on separate leaves or sheets of the said book, and when the volume is opened at this place they constitute the two pages thus revealed. A lithographed copy of the map called the 'Knox Map' bearing the indorsements shown by the certified copy of said copy introduced in evidence by the complainant in this cause is pasted over and across both of said last mentioned pages of said record book. The said map is about the size of the said two pages and occupies substantially all of that space, thus making it constitute pages 130 and 131 of said record. On the next page of said record book, that is, page 132, and beginning at the top thereof, appears the record of the deed from Charles Bancroft, sheriff, Mobile county, to Theophilus L. Toulmin, a certified copy of which has been introduced in evidence by the complainant.

"(2) Exhibit A to the amended bill of complaint in this cause is a copy of the aforesaid copy of the 'Knox Map' introduced in evidence by the complainant as the same appears on pages 130 and 131 of said Deed Book No. 9. Exhibit B to the amended bill of complaint is a copy of the 'Dexter Map' as shown on page 527 of Deed Book 'N' in the office of the probate judge of Mobile county, Ala., and introduced in evidence by the complainant. Exhibit C to the bill of complaint as amended is a true copy of the map called the 'Pillans Map' as the same appears of record in cause No. 2104 in the chancery court of Mobile county, Ala., and also in map book No. 1, pages 1 and 2, in the office of the judge of probate of Mobile county, Ala., except that in each of the last mentioned records the map is drawn in black and white, there being no other coloring. For the purposes of this cause the above mentioned three exhibits may be used for and in lieu of the copies of the said respective maps introduced in evidence, thus saving the trouble and expense of duplicating the said maps in all records of this cause.

"(3) In connection with the introduction in evidence of a certified copy of deed from Norris and Magee, trustees, to Charles Smith, as recorded on pages 6 and 7 of Deed Book P in the probate court records of Mobile county, Ala., it is admitted that there are recorded in the deed records of Mobile county approximately 50 deeds made by the same grantors as the grantors mentioned in the above mentioned deed, all in the year 1835, all referring to the 'Dexter Map' and conveying to different grantees different portions of the area embraced in the 'Dexter Map,' each of said deeds being in general

form the same as the deed so introduced, and the reference to the map being the same as the like reference in the deed so introduced and referring to the lot and block numbers shown on the 'Dexter Map.'

"(4) The complainant introduced in evidence pages 120, 129, 138, 147, 155, 163, and 166 of the original Troost Ward Maps of the city of Mobile, on file in the city engineer's office. Since then the complainant has caused the drawings and writings on said pages to be traced, and respondents have ascertained that said tracing has been done accurately, and it is now agreed that the said tracings shall be substituted for said originals with the same effect as though the original pages remained in evidence. It is further agreed that the initials 'O. G.' on the said several pages stand for the words 'Orange Grove,' and also that the said Troost Ward Book or Ward Map is a volume containing maps covering all or a large part of the city of Mobile, made by Louis Troost, then the city engineer, about the year 1845, under employment for that purpose by the city council, and that the proceedings of so employing the said Troost recited that the maps were needed for the purpose of assessing property for taxes, and that the area so platted or mapped by the said Troost extended to One Mile creek and embraced all of the area in dispute in this cause; also that said pages are the only portions of said map or maps which show any of the area involved in this cause.

"(5) It is further admitted and agreed that there appears in the alphabet to the common council records of the city of Mobile, the following: 'Dean Knox, bill for hiring of labor, amounting to $37.50, referred 476. That he be paid $120 for a map of the Orange Grove tract, 541.' That this entry, which is an index entry, was made somewhere within the period covered by the years 1843, 1844, and 1845.

"(6) It is admitted that if there be any portion of Earle street east of Commerce street, the same is not involved in this cause, and that the east end of Earle street is in the navigable waters, and that no claim is made with respect thereto in this cause.

"(7) While no agreement as to occupancy or possession prior to the year 1870 is hereby made, yet it is hereby admitted by the complainant that ever since said year, the respondents, respectively, and those under whom they claim, have been in the actual occupancy and possession of all of the property which they, respectively, claim in this cause, such possession and occupancy having been continuous, open, notorious, adverse, and under claim of ownership.

"(8) In this case the provisions of section 6565 of the Code of Alabama shall control in so far as relevant and no objections to testimony need be made by either party, it being intended that the court shall not consider any testimony which is irrelevant, immaterial, or incompetent, even though no objection thereto be made."

The deed of trust or quitclaim deed referred to is as follows:

"Know all men by these presents that we, Philip McLoskey, John Hagan, James Hopkins, Jonathan Hunt, George Poe, Jr., John Bloodgood, Abner L. Lipscomb, Henry Bright and Henry Goldthwaite, for and in consideration of the sum of one hundred dollars' to us in hand paid by James Magee, Calvin Norris, and Thomas W. McCoy esquires of the city of Mobile and county of Mobile, the receipt of which money is hereby acknowledged, have remised, released and forever quitclaimed and by these presents do remise, release and forever quitclaim unto the said James Magee, Calvin Norris, and Thomas W. McCoy:

"All those several tracts or parcels of land lying and being in the city and county of Mobile hereinafter described, that is to say, of a certain tract or parcel of land commonly known and called the Orange grove, which was granted in the year one thousand seven hundred and sixty-seven by the British government to one William Richardson which said grant was recognized by the Spanish government the twenty-fifth day of September, one thousand eight hundred and seven and confirmed to John Forbes & Co. and which last mentioned grant or confirmation was recognized and confirmed by act of Congress on the third day of March, one thousand eight hundred and nineteen, as a perfect and complete title, the said tract containing three hundred and ten 77/100 arpens. Also of a certain tract or parcel of land adjoining the last mentioned tract on the north, and formally known as the Laurent plantation which was granted by the Spanish government the fifteenth day of November, one thousand seven hundred and ninety-six to one Bartelemi Laurent and which was recognized by the said Spanish government and confirmed the fourth day of March one thousand eight hundred and seven, to John Forbes & Co., which confirmation was by act of Congress of the third day of March one thousand eight hundred and nineteen, recognized as a complete and perfect title which last mentioned tract contains four hundred arpens more or less, with the greatest quantity and the most extended boundaries which the said tracts at any time had or may lawfully have, and also of all of the lands if any there may be lying between the aforesaid tracts of land or either of them and the Mobile river channel and between the lower and southern boundary line of the first mentioned tract of land and the Bayou Chatauge. To have and to hold the above described premises to them the said James Magee, Calvin Norris and Thomas W. McCoy and their assigns or the assigns of the survivors of them. In trust nevertheless under the restrictions limitations and provisions herein and by these presents expressed that is to say the said James Magee, Calvin Norris and Thomas W. McCoy or a majority of them or the survivor in case of death of one or more of them shall sell alien and convey the above granted lands on such terms as a majority of the grantors or their assigns, or the executor or administrator according to their respective interest shall and may direct, provided, however that they shall not sell the said lands in greater subdivisions than one acre nor more than one-fourth of the quantity in one year without the unanimous consent of the grantors or their assigns or their executors or administrators, and on the further trust that should the grantors obtain a charter of incorporation before the whole trust shall have been executed and closed, then and in that event it shall be the duty of the said James Magee, Calvin Norris, and Thomas W. McCoy or a majority of them or the survivor, on and under the direction and by and with the advice and consent of such number of the grantors, their assigns or their executors or admin-

istrators as would represent at least nineteen twenty-fourths of the whole interest to convey all the land unsold all mortgages and evidences of debts due to them as trustees to the said corporation for the use of the corporators their assigns or executors or administrators in proportion to their respective interests and fully to account to the said corporation for all moneys received by them in the execution of their trust, and under the further trust that the said James Magee, Calvin Norris and Thomas W. McCoy or the survivor shall deposit all moneys received by them at any time in the execution of their trust in the Bank of Mobile to the credit of the grantors or their assigns or executors or administrators in proportion to their respective shares.

"And the said Philip McLoskey, John Hagan, James Hopkins, Jonathan Hunt, George Poe, Jr., John Bloodgood, Abner L. Lipscomb, Henry Bright and Henry Goldthwaite hereby declare that they are interested in the premises above in trust conveyed for the uses aforesaid in the following proportions, that is' to say the said Philip McLoskey eight and a half forty-eighths and the said John Hagan five and three-quarters forty-eighths and the said James Hopkins two and three quarter forty-eighths and the said Jonathan Hunt fourteen forty-eighths, and the said George Poe, Jr., five forty-eighths and the said John Bloodgood four forty-eighths and the said Abner L. Lipscomb four forty-eighths and the said Henry Bright two forty-eighths and the said Henry Goldthwaite two forty-eighths and it is further provided that should the trust here constituted not be fully executed within six years then the said James Magee, Calvin Norris and Thomas W. McCoy or the survivor as the case may be shall hold the residue in trust for the grantors or their assigns or the executors of administrators in proportion to their respective interests, and Emma M. Poe, wife of the said George Poe, Jr., Eliza G. Lipscomb, wife of the said Abner L. Lipscomb and Emily N. Bright, wife of the said Henry Bright in consideration of the sum of ten cents to them severally paid the receipt whereof they do hereby acknowledge do by these presents release and relinquish to the said Calvin Norris, James Magee and Thomas W. McCoy, as trustees as aforesaid, all their and each of their dower right and title of dower in and to the before mentioned and described premises.

"In witness whereof the said parties of the first part to these presents have hereunto set their hand and seals this first day of May in the year of our Lord one thousand eight hundred and thirty-five. Signed, sealed and delivered in presence of

"I. W. Townsend.
"Charles Smith.

|  |  |
|---|---|
| "Philip McLoskey | [Seal.] |
| "John Hagan, by His | |

"Attorney in Fact, Philip McLoskey.   [Seal.]

"James Hopkins, by His

"Attorney in Fact, Philip McLoskey.

|  |  |
|---|---|
| "Jona Hunt. | [Seal.] |
| "George Poe, Jr. | [Seal.] |
| "Emma M. Poe. | [Seal.] |
| "Abner L. Lipscomb. | [Seal.] |
| "Eliza G. Lipscomb. | [Seal.] |
| "John Bloodgood. | [Seal.] |
| "Henry Bright. | [Seal.] |
| "Emeline M. Bright. | [Seal.] |
| "Henry Goldthwaite. | [Seal.]" |

The following deed from Norris and Magee as trustees to Smith is illustrative of the conveyances executed by such trustees in accordance with the deed of trust hereinabove set forth, the record reciting the admission by the defendants that approximately 50 of such conveyances were made by these trustees in 1835, conveying different parcels embraced in the area shown by the Dexter Map and made with reference thereto:

"This indenture made and entered into this twenty-sixth day of May in the year of our Lord one thousand eight hundred and thirty-five between Calvin Norris and James Magee of the city of Mobile, of the first part and Charles Smith of the city of Mobile of the second part, witnesseth: That whereas Philip McLoskey, John Hagan, James Hopkins, George Poe, Jr., and Emma M., his wife, Jonathan Hunt, John Bloodgood, Henry Bright and Emeline, his wife, Abner L. Lipscomb and Eliza G., his wife, and Henry Goldthwaite, by their certain deed bearing date the first day of May in the year of our Lord one thousand eight hundred and thirty-five which deed is of record in the office of the clerk of the county court of Mobile county in Book O, pages 8, 9, and 10 did convey to the said parties of the first part together with Thomas W. McCoy those certain tracts or parcels of land situate in the city and county of Mobile, and known as the Orange or Poplar Grove and the Laurent plantation (the boundaries of which are set forth in the said deed) and also all the lands between the said tracts of land or either of them and the channel of Mobile river upon certain trusts in the said deed specified one of which trusts is that the said James Magee, Calvin Norris and Thomas W. McCoy or a majority of them, or the survivor in case of death of one or more of them, shall sell, alien, and convey the said lands on such terms as a majority of the said grantors in the said deed or their assigns or their executors or administrators according to the scale of their respective interests shall or may direct, provided that the said James Magee, Calvin Norris and Thomas W. McCoy shall not sell the said lands in greater subdivisions than one acre nor more than one-fourth of the whole quantity in one year without the unanimous consent of all the grantors or their assigns or their executors or administrators. And whereas a majority of the said grantors according to the scale of their respective interests in the said deed expressed have directed the said parties of the first part to sell a portion less than one-fourth of the said lands at public auction on the following terms: One-fourth cash or approved indorsed notes, one-fourth one year, one-fourth two years, one-fourth three years, with interest at the rate of six per cent. per annum secured by mortgage. And the said parties of the first part having exposed a portion of the said lands less than one-fourth and in tracts less than one acre to public auction on Monday the twenty-fifth day of May and the day after in the year of our Lord one thousand eight hundred and thirty-five, and at such public sale the said party of the second part become the purchaser of the lot of land hereinafter described for the sum hereinafter named, now therefore, the said parties of the first part for and in consideration of the sum of six thousand and twenty-five dollars paid and secured to be paid by the said party of the second part in compliance with the

said terms of sale have conveyed, released, remised, and quitclaimed, and by these presents do convey, release, remise, and quitclaim unto the said party of the second part the following described lots or parcels of land·situate, lying, and being in the city of Mobile, and part and parcel of the land to be conveyed by said deed that is to say, * * * all of the said lots having the figure and dimensions as represented on a plat or plan of the same projected by A. A. Dexter and by reference to which the same were sold. To have and to hold the aforedescribed premises to the said party of the second part his heirs and assigns forever.

"In witness whereof the said parties of the first part have hereunto set their hands and seals, the day and year first above written.

"Calvin Norris.     [L. S.]

"James Magee.     [L. S.]"

The following deed was offered in evidence by the complainant:

"To All People to Whom These Presents shall Come—Greetings:

"Know ye, that I, John Bloodgood, for and in consideration of the sum of twenty-five hundred dollars lawful money of the United States of America to me in hand paid by A. M. Griffin at or before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has remised, released, and forever quitclaimed and by these presents do remise, release, and forever quitclaim unto the said A. M. Griffin in my full and actual possession now being, and to his heirs and assigns forever, all the estate, right, title, interest, use, trust, property, claim, and demand whatsoever at law as well as in equity in possession, as well as in expectancy of, in, to, or out of all and singular those two certain lots of land situated in the city of Mobile on the northeast corner of Hunt and Magnolia streets and having a front on Hunt street of eighty feet (say 80 feet) by an even depth of one hundred fifty feet, being lots numbered one and two in square two hundred and eighty of the Orange Grove tract as laid off and map made for the proprietors by D. Knox. To have and to hold the said released premises unto the said A. M. Griffin, heirs and assigns. To his own proper use, benefit, and behoof forever. So· that neither the said John Bloodgood his heirs or assigns nor any other person or persons in trust for him or in his name or names or in the name right or stead of any of them, shall or will, can or may by any ways or means whatever hereafter have claim, challenge or demand any right, title, interest or estate of, in, to, or out of the said premises above described and hereby released. But that he said John Bloodgood his heirs and assigns each and every of them from all estate, right, title interest, property claim and demand whatsoever of, in to or out of the said premises or any part thereof, are is and shall be by these presents, forever excluded and debarred.

"In witness whereof the said John Bloodgood has hereunto set his hand and seal this 10th day of January in the year of Our Lord one thousand eight hundred and fifty-five.

"John Bloodgood [Seal.]

"Per  M.  H.  Bloodgood."

The bill in chancery, filed by the cestuis que trust against the trustees in the trust deed hereinabove set forth, is in substance as follows:

"First. That in the year 1807 there were granted to the firm of John Forbes & Co., by the Spanish authorities at Mobile, in full property and by complete grants, two parcels of land known to the inhabitants of the county then and now as the Orange or Poplar Grove tract and the Laurent plantation, both of which lie within the corporate limits of the city of Mobile.

"Second. That these grants were recognized as valid, and confirmed by the United States by act of Congress passed 3d March, 1819, and to be found in volume 3, Statutes at·Large, page 528—Acts 15th Congress Session 2d, chapter 100.

"Third. That under a decretal order of the circuit court of Mobile county, sitting in chancery in a suit commenced by James Innerarity, one of the members of the said firm of John Forbes & Co., against the heirs of said Forbes and John Innerarity, the remaining representatives of said firm and grantees, these two parcels of land were sold in 1830 by the said Innerarity to Jonathan Hunt, Phillip McLoskey, Henry Hitchcock, and John Bloodgood—all of which will fully appear by a reference to the record of said suit in this court and the deed of said Innerarity to said parties.

"Fourth. That in 1835 the said parcels of land were held in full property by Phillip McLoskey, John Hagan, John Hopkins, Jonathan Hunt, George Poe, Jr., John Bloodgood, Abner S. Lipscomb, Henry Bright, and Henry Goldthwaite, under the conveyance of James Innerarity aforesaid, and under conveyances from the persons claiming title from him under the sale aforesaid.

"Fifth. That being so possessed of said parcels of land, the said parties made the deed hereunto attached marked Exhibit A, by which they conveyed the lands specified herein, to wit, the aforementioned two parcels of land to the defendants in this suit upon the trusts therein declared, and the said trustees entered into possession and have been seized thereof in fee simple, and now so hold in trust the said parcels of land except so much thereof as is hereinafter set forth.

"Sixth. That in the year 1835 and again in 1836 the said defendants James Magee, Calvin Norris, and Thomas W. McCoy, under the terms of said trust deed and by the direction of their cestui que trust, sold a very valuable portion of said lands, being nearly all of said parcels south of Bloodgood street, and executed the requisite conveyances therefor, thereby divesting their title to the portions so sold.

"Seventh. That a valuable portion of said lands has been condemned for the use of the Mobile & Ohio Railroad Company, and said Company have taken possession of the same.

"Your orators, without confirming said·act of condemnation, for the purposes of this suit will make no opposition thereto. Your orators do not include the portion so condemned in the prayer of this bill.

"Eighth. Your orators further show that James Magee has removed from the State of Alabama, that Calvin Norris has for a long time resided in the interior of this state and does not often visit the city of Mobile, and that Thomas W. McCoy has not in any manner occu-

pied himself about said trust, that all of said trustees have treated said trust as a nominal thing requiring no care nor attention on their part.

"Ninth. That there has been much waste and spoliation of said property, much damage done thereto, and that the rights and interests of your orators have been much impaired by the inattention and neglect it has experienced.

"Tenth. Your orators further represent to your honor that your orators are seized of the equitable fee simple in said parcels of land in the following proportions, to wit. * * * Your orators represent that they have in due form of law derived their titles thereto from the grantors in the deed made in 1835 to the defendants in this suit whereof Exhibit A is a copy.

"Eleventh. Your orators further represent that they are desirous of making a partition of said property described in said deed of trust which was not disposed of by the trustees in 1835 and 1836, and not included in the condemnation in favor of the Mobile & Ohio railroad company, and which is north of Bloodgood street or is west of Lawrence street, unsold.

"Twelfth. Your orators feel that they will experience some difficulty in consequence of the absence of James Magee and Calvin Norris and the change in the equitable titles, and they prefer that the division be made under the direction of this court.

"Thirteenth. They are apprehensive that the partition cannot be effected with equality without a sale of the property, and from the number of the parties in interest they fear that deaths may occur to obstruct the proceedings before partition can be effected.

"Fourteenth. Your orators believe that a sale under the direction of trustees to be appointed in the place of Norris and Magee, and with the concurrence of two or more of the trustees, would be the most favorable mode of settlement and distribution.

"Fifteenth. Your orators further represent that under said trust deed, of which Exhibit A is a copy, the trustees have no power to sell or partition said lands, and they believe and represent that the difficulties before mentioned render an application to a court of chancery necessary and proper.

"In consideration whereof your orators pray that James Magee, Calvin Norris, and Thomas W. McCoy may be made parties to this bill, and may answer the same; and your orators respectfully ask of your honor to establish them as the persons seized of the equitable estate in the unsold portions of said parcels of land, subject to all the rights of the Mobile & Ohio Railroad Company.

"Second. That your honor would make a decree for the sale of the said property so unsold and not condemned in city lots or squares to be laid off in conformity to the plan adopted at the sales in 1835 and 1836.

"Third. That the sales be conducted under the direction of any two of the trustees, or, in case they do not attend, of a committee of the plaintiffs to consist of John Bloodgood, John A. M. Battle, Jacob Magee, Newton St. Hohn, and Moses Waring, any two of whom may act as a majority of said committee may designate.

"Fourth. That said sales be conducted as chancery sales usually are, and that any two of said trustees may make the conveyances.

"Fifth. That the purchasers pay one-fourth of the purchase money in cash and the balance in one and two years, with interest secured by mortgage with power of sale to the trustees and their assigns.

"Sixth. That at least 25 per cent. of said land be sold every 9 months, and that on sales to that extent a majority of the trustees or of the committee aforesaid may adjourn the sales from time to time.

"Seventh. That the trustees under the directions of said committee shall have a discretionary authority to cause surveys and plans to be made so as to prepare the property for sale, and that until said lands be disposed of shall have the sole right to possess the same and to take in trust for the plaintiffs any profits that may arise therefrom by the sale of wood, dirt, or other commodity.

"Eighth. That each shareholder may bid at the sale for any of the lots and purchase the same in his name; and that all purchases so made shall be a credit on their claim upon the fund to the extent of their interest thereon.

"Ninth. That all the moneys paid and mortgages and notes taken shall be divided ratably and without indorsement or guaranty by the respective shareholders.

"Tenth. Your orator further prays that Edward C. Johnson and M. H. Bloodgood may be appointed cotrustees with said Thomas W. McCoy in lieu of said James Magee and Calvin Norris, with the same estate and with the powers hereinabove named.

"And that your orators may have such further relief or such other relief as the nature of their case may require and as shall be agreeable to equity.

"May it please your honor to grant unto your orators writs of subpœna to be issued to the said Thomas W. McCoy and Calvin Norris, who are shown to reside within the state of Alabama, and to grant an order of publication against the said James Magee, who is shown to reside out of the state of Alabama and to be of mature age, commanding them and each of them to appear on a certain day before this honorable court and then and there full and true answers make to all and singular the premises, and to stand to, perform, and abide such further direction and decree therein as to your honor may seem meet."

The decree of the chancery court upon the bill is as follows:

"This cause came on to be heard at this term on bill, exhibit, and decree pro confesso, and thereupon it is ordered, adjudged, and decreed that the defendants James Magee and Calvin Norris be and the same are hereby removed from their office as trustees under the deed of May 1, 1835, and M. Hilbreth Bloodgood and Edward C. Johnson be and are hereby appointed in their room as cotrustees with the defendant Thomas W. McCoy.

"And it is further ordered, adjudged, and decreed that so much of the premises described in the bill and conveyed by said deed of May 1, 1835, to the defendants as lies north of Bloodgood street, and so much thereof as lies to the south of Bloodgood street and west of Lawrence street, which was not included in the condemnation in favor of the Mobile & Ohio Railroad Company nor disposed of by said defendants at the sales of 1835 and 1836, be sold in city,

lots or squares, to be laid off in conformity with the plan adopted at the sales of 1835 and 1836.

"It is ordered that the sales be made under the direction of any two of the trustees named in this decree,.or, in case they do not attend, under the directions of a committee of the plaintiffs, to consist of John A. M. Battle, John Bloodgood, Jacob Magee, Newton St. John and Moses Waring, any two of whom may act as a majority of said committee may designate.

"That the sales be conducted as chancery sales usually are but at such place as said trustees under the instruction of said committee may designate and that any two of the trustees may make and execute the conveyances.

"That said lots be sold for one-fourth cash and the balance on a credit of one and two years, with interest, and that said balance be secured to the trustees and their assigns by mortgages with powers of sale.

"That said sales be made between January 1, and May 15 of each and every year from the date of this decree until the whole of said lands is disposed of, and that at least 25 per cent. of the bulk of the same be sold at each sale, and that on sales to that extent a majority of the trustees, or, in case they do not act, of the committee aforesaid, may adjourn the sales from time to time.

"That each shareholder may bid at such sales for any of the lots and purchase the same in his own name, and that all purchases so made shall be a credit on his claim upon the fund arising from the sale at which he so bids to the extent of his interest therein.

"That within one month after each sale all the moneys paid and notes and mortgages taken shall, after payment of the expenses of said sale and the preparations therefor, be divided ratably and without indorsement or guaranty, among the respective shareholders.

"That the trustees, under the directions of said committee or a majority of them, shall have a discretionary power to cause surveys and plans to be made and streets to be marked out, filled up, and graded so as to prepare and to expose the lands for sale to the best advantage.

"And that until said lands be disposed of the trustees shall have the sole right to possess the same and to take in trust for the shareholders any profits that may arise from the sale of dirt, wood or other commodity.

"It is further ordered, adjudged, and decreed that all the estate rights and title heretofore existing in Norris, Magee, and McCoy, the defendants in this suit by and under the said deed of May 1, 1835, be and are by this decree transferred to and vested in Thomas W. McCoy, Edward C. Johnson, and M. Hildreth Bloodgood, the trustees herein appointed, to hold the same for the uses and purposes herein and hereby expressed, declared and decreed, and that they be and are by this decree clothed with full power and authority to carry out and effect the same."

The following is the report of the trustees in execution of the decree:

"The undersigned, Thos. W. McCoy, M. H. Bloodgood, and Ed. C. Johnson, trustees of the lands in the city of Mobile, described in the bill in this cause, respectfully report that, in obedience to the decrees of this court rendered on June 25, 1857, and February 26, 1858, they proceeded and prepared the property for sale by opening the streets and otherwise clearing and defining the squares and lots.

"Their proceedings in this respect were duly sanctioned by the committee of shareholders appointed for that purpose.

"They further report that on April 18, 19, 20, and 21st, 1859, they sold at public outcry the larger part of the property to sundry persons, on the terms prescribed by the decree, and subsequently, in May 14, A. D. 1860, they sold the remainder of the property upon the same terms. The aggregate of proceeds of sales was $193,120, the aggregate of disbursements, including commissions allowed by said committee, $29,791.87.

"The trustees have conveyed the property to the purchasers thereof, and have distributed the net proceeds of sales (money and securities) among the shareholders, excepting the sum of six thousand eight hundred and five ($6,805.00) dollars, the proceeds of two shares, (that is, of 2/48), the title to which was in dispute; which last sum, they have paid into this court, under its order made at the last term (February, 1860).

"These trustees herewith file in this court a book showing their receipts and disbursements about the matter of this trust property, with a plat of the land, containing the squares and lots regularly numbered, and showing also the purchaser of each lot of land, and how and to whom the proceeds of sale were distributed.

"The said trustees ask that this, together with said book, which is marked 'Orange Grove Tract, Sold at Public Auction, April 18, 19, 20, 21, 1859, by Br. Tardy & Co., Auctioneers,' may be accepted as their final Report that the same may be recorded in this court, and that they, the said trustees, may be forever discharged from every, all, and further responsibility as trustees aforesaid, about the matters of trust, by said decrees confided to them.

"All which is respectfully submitted.

"Thomas W. McCoy.
"M. H. Bloodgood.
"M. H. Bloodgood,
"For E. C. Johnson."

The following is one of the several deeds executed by the trustees in execution of the decree herein set forth:

"This indenture made the twenty-first day of April, in the year of our Lord one thousand eight hundred and fifty-nine, between Thomas W. McCoy, Edward C. Johnson and M. Hildreth Bloodgood trustees of the Orange Grove of the first part and E. V. George of the second part. Witnesseth, that whereas under and by virtue of the power and authority conferred upon them by a decree of the chancery court held at Mobile, dated the 25th day of June, 1867, in a cause wherein Adams, Smith and others were complainants and McCoy, Norris and Magee defendants and now of record on pages 140 and 141 in Book of deeds No. 12, N. S., in the office of the judge of probate of Mobile county, and by an amendment thereto made and entered in said county on the 26th of February, 1858, the said parties of the first part did in accordance with the terms and conditions of said decree and amendment on the 18th day of April, 1859, after due notice thereof for thirty days in two newspapers published in the city of

Mobile, expose for sale in front of the post office in said city, a place designated by the committee in said decree named, the portions of the Orange Grove and Lorent plantation which were not disposed of at the sale thereof in 1835 and 1836, nor condemned in favor of the Mobile & Ohio Railroad Company in city lots or squares laid off in conformity with the plan adopted at the said sales of 1835 and 1836. And whereas at said sale the party of the second part was the highest and best bidder and became the purchaser of the parcel thereof hereinafter described. Now, therefore, we the said parties of the first part for and in consideration of the sum of three hundred dollars, to us in hand paid, have conveyed, released and quitclaimed, and by these presents do convey, release and forever quitclaim unto the said party of the second part all and singular the following lot and parcel of land situate in the city of Mobile and bounded and described as follows, to wit, * * * as laid down in a plan of a part of the Orange Grove made and projected by P. J. Pillans, city surveyor, at the instance of said parties of the first part under the direction of the committee aforesaid, and now of record in Book of Maps No. 1, pages 1 and 2, in the office of the judge of probate, of Mobile county, to have and to hold the premises also described, to the said party of the second part, and to his heirs and assigns forever. Witness our hands and seals the day and year first above written. Thomas W. McCoy. [L. S.]
"E. C. Johnson. [L. S.]
"M. H. Bloodgood. [L. S.]"

The following is the patent from the United States to Jonathan Hunt:

"Pre-emption Certificate No. 4597.
"The United States of America to All to Whom These Presents shall Come—Greeting:
"Whereas Jonathan Hunt, assignee of Gerald Byrne, has deposited in the General Land Office of the United States a certificate of the register of the land office at St. Stephens whereby it appears that full payment has been made by the said Gerald Byrne according to the provisions of the act of Congress of the 24th April, 1820, entitled 'An act making further provision for the sale of the public lands,' for the fractional section fourteen in township four south of range one west in the district of lands subject to sale at St. Stephens, Alabama, containing fifty-two acres and sixty-five hundredths of an acre according to the official plot of the survey of the said lands, returned to the General Land Office by the Surveyor General, which said tract has been purchased by the said Gerald Byrne:
"Now know ye that the United States of America, in consideration of the premises and in conformity with the several acts of Congress in such case made and provided, have given and granted and by these premises do give and grant unto the said Jonathan Hunt and to his heirs the said tract above described, to have and to hold the same, together with all the rights, privileges, immunity and appurtenances, of whatsoever nature, thereunto belonging unto the said Jonathan Hunt and to his heirs and assigns forever.
"In testimony whereof, I, Andrew Jackson, President of the United States of America, have caused these letters to be made patent and the seal of the General Land office to be hereunto affixed. Given under my hand at the city of Washington the twenty-third day of June, in the year of our Lord one thousand eight hundred and thirty-four and of the Independence of the United States the fifty-ninth."

Complainant's witness, J. L. Commings, an engineer of 21 years' experience, testified that he was familiar with the plats and maps here involved, and the lines, dimensions, and directions shown by the Knox Map; that he had fixed the location of lots in blocks fronting towards One Mile creek, between Earl and Lee streets, as they relate to said creek; that, according to the lines and dimensions of the Knox Map, the distance between Earl and Lee streets of the property line of lots fronting on Marmotte wharf is something over 2,000 feet; that, applying the description in the deed of the trustees to Wiswall to the dimensions given in the deed and · on the Knox Map and the Pillans Map, the average distance of the space left between block 312 and One Mile creek would be about 75 feet, this being arrived at by scaling it on the map; that, with reference to the description, the figures on the Knox and Pillans Maps appear to be the same; that if the dimensions of lots in blocks fronting the space in question on the bank of One Mile creek is applied to the blocks fronting One Mile creek between Lee street on the north and Earl street on the south, these dimensions, according to the Pillans Map leave a connected space of about equal width along the west bank of One Mile creek from 60 to 85 feet; that there are lots in those blocks up to the point where this space connects with Orange street that would not have an outlet—lots 23 in block 336, 10 in block 341, 6 and 10 in block 365, and 8 in block 312.

On cross-examination, this witness testified that the instrument shown him, and about which he testified on direct examination, purported to be a deed from McCoy, Johnson, and Bloodgood, as trustees, to Wiswall, dated April 21, 1859; that this deed described the lots as being in square 312, which square is bounded on west by Water street, on east by Commerce street, south by Earl street, and north by Poe street and by Bayou Marmotte or One Mile creek; that according to the declarations of the deed, the square is bounded in part by Bayou Marmotte, but that the description of the lots did not reach it; that witness had checked the Knox and Pillans Maps together, and that there were some slight differences in them as to dimensions of lots, and some differences as to arrangement of streets.

On redirect examination the witness testified that, in a second deed from the trustees to Wiswall, dated June 9, 1859, there was a more minute description of the lots conveyed.

The maps referred to hereinabove and in the opinion of the court as the Knox Map, the Pillans Map, and the Dexter Map, are respectively as follows:

The above map is a correct copy of that part of the city of Mobile known as the Orange Grove Tract as surveyed by me at the instance of the proprietors.—

(Signed) DEAN KNOX, U.S.D. SURVEYOR
Mobile Aug 2, 1844

PLAN
OF A PART OF
ORANGE GROVE
CITY OF
MOBILE.
BY
*P. J. PILLANS.*
City Surveyor

PLAN OF A PART OF THE
ORANGE GROVE TRACT
REDUCED FROM THE ORIGINAL MAP

Drawn by A. A. Dexter Civil Engineer
May 1835

Surveyed by Dean Knox.

The effect of these and various other muniments of title offered in evidence, and of all of them collectively, is stated in the opinion of the court.

Thos. C. McClellan, of Birmingham, and Frank J. Yerger, of Mobile, for appellant.

Where the owner of land plats it and subdivides it into lots and public ways, and sells even a single lot by reference to the plat or map delineating the area as an urban site, he irrevocably dedicates to the public use public ways or spaces shown on such survey. Webb v. Demopolis, 95 Ala. 116, 13 So. 289, 21 L. R. A. 62; Stack v. Tenn. Land Co., 209 Ala. 449, 96 So. 355; City of Mobile v. Chapman, 202 Ala. 194, 79 So. 566; Highland Realty Co. v. Avondale Co., 174 Ala. 326, 56 So. 716. Where a map is referred to in a grant or deed as indicating what is intended to be conveyed, it is to be regarded as a part of the conveyance. City of Mobile v. Chapman, supra; Little v. Thomas, 204 Ala. 66, 85 So. 490. Acceptance of a conveyance by a grantee, in which the existence of a public way is recognized, irrevocably concludes the grantor, the grantee, and their successors in title to the fact that the way referred to is a public way. Rudolph v. City of Birmingham, 188 Ala. 620, 65 So. 1006; Highland Realty Co. v. Avondale Co., supra; McCravey v. Remson, 19 Ala. 437, 54 Am. Dec. 194; Kennedy v. Brown, 61 Ala. 298; Meldahl v. Wallace, 270 Ill. 220, 110 N. E. 354;· 21 C. J. 1088, 1095; 10 R. C. L. 685, 687; Pendrey v. Godwin, 188 Ala. 565, 66 So. 43. Where the design of a trust contemplates the platting of an urban area and sale of lots with reference thereto, the trustee, empowered to execute the trust, may effect a complete dedication of streets and other public ways. 8 R. C. L. 885; McCloskey v. Pacific Co., 160 F. 794, 87 C. C. A. 568, 22 L. R. A. (N. S.) 673; 119 U. S. 526, 7 S. Ct. 308, 30 L. Ed. 469. The intention of the owner in making the plat is to be ascertained from all the marks appearing thereon. 9 A. & E. Ency. Law (2d Ed.) 60. Where a grantee asserts no other right or title than that conveyed by deed, he cannot deny his grantor's title against another grantee. 21 C. J. 1071. A description by reference to a map prevails over metes and bounds, or courses and distances, in cases of conflict. 8 R. C. L. 1078; 99 Wis. 20, 74 N. W. 574, 40 L. R. A. 828; 122 Va. 274, 94 S. E. 781, L. R. A. 1918C, 520. Proof of possession raises a presumption of title. If possession is the only evidence of title, then title is established. Dodge v. Irvington Land Co., 158 Ala. 91, 48 So. 383, 22 L. R. A. (N. S.) 1100. A dedication is effective, if the dedicator afterwards becomes the owner, or if he is estopped to deny its validity. 8 R. C. L. 885; Lee v. Lake, 14 Mich. 12, 90 Am. Dec. 220; 18 Johns. 174, 9 Am. Dec. 200. The purchaser of real estate with reference to a plan, on which streets are delineated, may not after-

wards close up such streets. Sheen v. Stothart, 29 La. Ann. 630; Whitfield v. Horrocks, 15 Ill. App. 315; Merrill v. Newton, 99 Mich. 225, 58 N. W. 69; Marble v. Price, 54 Mich. 466, 20 N. W. 531. If the instrument relied on for dedication is ambiguous, the construction given must be against the dedicator, and in favor of the public. 18 C. J. 108, 109, 110. Where dedication is made by two instruments, they may be considered and examined together, to determine the sufficiency, completeness, and extent of dedication. A recorded plat may be construed with a deed to determine dimensions, etc. 18 C. J. 110, 280. An ancient copy is properly admitted to prove an ancient document, and a recital in an ancient instrument of the existence of an antecedent instrument is presumptive proof of such existence. Hughes v. City of Tuscaloosa, 197 Ala. 595, 73 So. 90; 22 C. J. 947. The existence of an exercised power is presumed, if the document manifesting such exercise of the power is ancient. 22 C. J. 951. One who purchases real estate with knowledge, or actual, implied, or constructive notice, that it is burdened with an easement in favor of other property, takes subject thereto. 9 R. C. L. 805. Nonuser or nondevelopment of a dedicated area cannot effect to abandon or surrender the public right in it. Stack v. Tenn. Land Co., supra; Smith v. Opelika, 165 Ala. 633, 51 So. 821; City of Mobile v. Chapman, supra; Sherer v. City of Jasper, 93 Ala. 950, 9 So. 584; Harn v. Comm. Council, 100 Ala. 199, 14 So. 9. Unless authorized by the Legislature, a municipality has no power to divert streets from the use to which they were originally dedicated. State ex rel. v. L. & N., 158 Ala. 208, 48 So. 391; Webb v. Demopolis, 95 Ala. 116, 13 So. 289, 21 L. R. A. 62. The description in a deed is to be construed, if possible, so that no part of it will be rejected or rendered inoperative. C. & G. R. Co. v. Pilcher, 163 Ala. 406, 51 So. 11. It is not essential to dedication of streets, parks, etc., that any written markings so descriptive of such areas should be made on the map or plat. City of Florence v. Florence Co., 204 Ala. 177, 85 So. 516. The fact that the apparent authority for the record of the map is not disclosed does not destroy the binding force of reference thereto, and must be held to operate as an estoppel in pais against the party so recognizing the platting and dedication, and their successors in title. City of Mobile v. Chapman, supra. The existence and issuance of a patent may be overcome by evidence. Nelson v. Weekley, 195 Ala. 1, 70 So. 661.

Stevens, McCorvey, McLeod & Goode, of Mobile, for appellees.

A dedication is in its nature a conveyance of an interest in land. It is never presumed, and the burden of proving dedication and requisite ownership in the dedicator is upon the party asserting dedication. Johnson v.

Dadeville, 127 Ala. 249, 28 So. 700; West End v. Eaves, 152 Ala. 339, 44 So. 588; Hoole v. Atty. Gen., 22 Ala. 195; 18 C. J. 43. No presumption of ownership arises from the making or recording of a plat or map; it must be otherwise proven. 18 C. J. 94; Lawrenceburgh v. Wesler, 10 Ind. App. 153, 37 N. E. 956; Edonville v. Chicago, etc., Co., 77 Iowa, 69, 41 N. W. 568; Hanibal v. Draper, 36 Mo. 337; Porter v. Stone, 51 Iowa, 373, 1 N. W. 601. The issuance of a patent by the United States, in the absence of proof of an earlier grant, establishes that the land remained in the government until the issuance of the patent. Nelson v. Weekley, 195 Ala. 2, 70 So. 661; Reichert v. Sheip, 206 Ala. 653, 91 So. 618. Intention of the owner is the vital factor in determining a question of dedication. The conveyance and the plat are but parts of one act of dedication, and must be read together, in the light of relevant circumstances, to determine the intention of the owner and the effect of his acts. E. B. R. Co. v. B. M. F. Co., 160 Ala. 467, 49 So. 448; 18 C. J. 110. Deeds bearing the same date, made to convey separate lots to separate purchasers at an auction sale of the lots of a town site, will be held to take effect at the same time and be construed together, in determining a conflict of title between the purchasers. Pearce v. City of Denver, 13 Colo. 385, 22 P. 774, 6 L. R. A. 541; 26 R. C. L. 738. A blank unnamed space left on a map may or may not amount to a dedication, and presents an ambiguity which will authorize consideration of all relevant facts shedding light on the intent of the owner. 18 C. J. 61; Birge v. Centralia, 218 Ill. 503, 75 N. E. 1035; Poole v. Lake Forest, 238 Ill. 305, 87 N. E. 320; E. B. R. Co. v. B. M. & F. Co., supra. In case of doubt as to the extent or effect of an alleged dedication, the contemporaneous and subsequent continuous construction given and accepted by the public and the former owners will be considered. 18 C. J. 109; Shreveport v. Drouin, 41 La. Ann. 867, 6 So. 656; Pella v. Scholte, 24 Iowa, 283, 95 Am. Dec. 729; Barclay v. Howell, 6 Pet. 506, 8 L. Ed. 477; McAlpine v. C. G. & W., 68 Kan. 207, 75 P. 73, 64 L. R. A. 88, 1 Ann. Cas. 452; Adoue v. La Porte, 58 Tex. Civ. App. 206, 124 S. W. 134. Indication on a map of a certain space as a wharf, without more, does not show any intention to dedicate to the public; a wharf may be public or private, and its delineation and name on a map do not determine its character. Palen v. Ocean City, 64 N. J. Law, 669, 46 A. 774; 18 C. J. 65. Natural or artificial monuments control a plan or plat of survey referred to in a deed, in which such monuments are also used to mark boundaries, unless absurd consequences would ensue, or unless it is obvious that courses and distances furnish the most certain guides. Crampton v. Prince, 83 Ala. 250, 3 So. 519, 3 Am. St. Rep. 718;

Miller v. Cullom, 4 Ala. 581; Barker v. Mobile Elec. Co., 173 Ala. 36, 55 So. 364.

SAYRE, J. The bill in this cause, filed by the state on the relation of the Attorney General, sought to abate alleged public nuisances consisting of a sawmill, buildings, and other structures maintained in public streets of the city of Mobile and in an area measuring approximately 75 by 2,000 feet lying alongside Bayou Marmotte, or One Mile creek in said city, and shown on the map known as the "Pillans Map," which is recorded in Map Book 1, at page 1, in the office of the judge of probate of Mobile county, a copy of which is exhibited with the bill, whereon said area is shown as a space without designation. Appellant had relief as against obstructions maintained by some of the appellees on certain streets appearing on the map, and in the projections of the same streets across the area to which we have referred, down to the water's edge; but other relief was denied, on the finding that there had been no dedication to public use of the area to which for convenience we now refer as "Marmotte wharf" and that, moreover, title to so much of the "Marmotte wharf" and of the streets named in the bill as lie in section 11, township 4 south, range 1 west, had remained in the United States until a time postdating the acts of dedication for which appellant contends, and so that, as to so much of the streets and mentioned area as lie within that section, there had been at the time of the dedications contended for no power to dedicate in the alleged dedicators. Appellees make no complaint of the decree wherein it granted relief according to the prayer of appellant's bill.

There is no claim of a dedication under the statute (Code 1923, § 10357 et seq.), the dedication contended for having long antedated the statute.

So then, as to the "Marmotte wharf," pretermitting for the time being consideration of the diversity in its parts effected by the street extensions already mentioned and the alleged government ownership of section 11, the contention for appellant is: (1) That this area was definitely and irrevocably dedicated to public use by the platting and sale in 1835-36 of lots in a part of the "Orange Grove tract"—within the bounds of which tract lie all the ways and areas in dispute—as shown on a map or plat projected by A. A. Dexter, by reference to which the lots were sold; and (2) by sales in April, 1859, under judicial decree made by reference to the "Pillans Map," which is (to the extent thereby shown) a substantial duplicate of the map of the "Orange Grove tract" prepared in 1835, probably, by Dean Knox "at the instance of the proprietors," except that in the older map the inscription "Marmotte wharf" appears in the space now in controversy, where-

as in the "Pillans Map" no such inscription appears.

[1] As for the sales made in 1835–36, we do not find that they effectuated a dedication of the area in controversy. These sales were made with reference to the "Dexter Map," which shows a plat of the territory south of Hunt street, running east and west; but the "Marmotte wharf" area, as well as the streets, properly so called, in controversy, lies entirely north of Hunt street, from which, at its nearest approach, it is removed by the space of two blocks at least—some 700 or 800 feet.

The "Dexter Map," of date 1835, was inscribed as follows:

"Plan of a Part of the
Orange Grove Tract
Reduced from the Original Map.
Scale 150 Feet to an Inch.
Drawn by A. A. Dexter, Civil Engineer,
May, 1835."

And in another place:

"Surveyed by Dean Knox."

To the extent of the territory shown thereon, the "Dexter Map" is a copy of the "Dean Knox Map," as a comparison of the two readily discloses. On the strength of this likeness or identity of appearance and the inscriptions noted above it is asserted that the sales of 1835–36 must be taken as made with reference to the "Dean Knox Map," and therefore as evidencing a dedication to public use of the "Marmotte wharf" as it appears on the last named map. These sales were made by trustees in pursuance of a deed of trust executed and delivered to them in 1835 by the original proprietors of the entire "Orange Grove tract" (containing in itself more than 300 arpens) and other adjacent tracts. The purpose of the trust was that the trustees (of whom there were three) or a majority of them, should, within six years, sell the land for the use and benefit of the grantors on such terms as a majority of the grantors or their assigns might direct, "provided however that they shall not sell the said lands in greater subdivisions than one acre nor more than one-fourth of the quantity in one year without the unanimous consent of the grantors or their assigns." By said deed any part of the lands remaining unsold after six years was to be held by the trustees in trust for the grantors or their assigns in proportion to their respective interests. The "Dean Knox Map" is an ancient document (Barker v. Mobile Electric Co., 173 Ala. 36, 55 So. 364), and we do not doubt that the court may now proceed on the assumption that it was made at the instance of the proprietors, meaning the grantors, or the trustees in the deed of trust mentioned above, acting in harmony with the grantors, and it may be conceded, though such concession would rest upon shrewd surmise rather than upon established facts, that the platting shown thereon was prepared for the purpose of a sale of the land in what may be now designated as city lots. But though that purpose be conceded it does not appear that the proprietors or their trustees ever sold a lot with reference to that map. How then are they or their successors in interest and title to be bound by that map? We have quoted above every inscription on the "Dexter Map" which by any process of inference, however remote, can be held to have reference to the "Knox Map." These inscriptions are not parts of Dexter's Map; that is, they contribute nothing to its delineation of the locality with which it dealt. They are in fact nothing more than an acknowledgment by Dexter of his indebtedness—to Knox, or Knox's map, it may be conceded—for the information embodied in his (Dexter's) map. The reference is to an "original map," and the further inscription is, "Surveyed by Dean Knox." This falls short of that clear and distinct designation of a map required by the authorities in the case of a dedication by map, as we shall see. But, conceding for the argument the clearness and distinctness of the designation, it is insufficient to effect a dedication for the reason that the reference is too remote.

It does not follow in law or logic that the reference in the deeds of 1835–36 to the "Dexter Map" should conclude the grantors to every line shown by the "Knox Map," though the former was in fact a copy, as far as it went, of the latter. Each was a self-contained unity, the "Dexter Map" as much so as the "Knox Map," and by the reference to the "Dexter Map"—which purported to be, not a part of the plan of the "Orange Grove tract," as appellant's brief phrases it, but a plan of a part of that tract, and nothing more—it can be fairly inferred only that the grantors in these sales intended to be bound by the lines and inscriptions of that map only, for, otherwise, the reference would have been to some other map—to the "Knox Map," if they had intended to be bound by that map. As I see it, no satisfactory reason can be assigned why the grantors had the "Dexter Map" prepared and made sales with reference thereto if in fact they intended to be bound by the larger and more inclusive "Knox Map." It would have been as convenient and, for aught I can see, as satisfactory in every respect to have made sales according to the larger map they already had, if, for reasons satisfactory to themselves and resting in their unreviewable discretion as proprietors, they had not desired to avoid the implications of the larger map.

[2] The accepted rule of the authorities in regard to the effect of a reference to a map or plat in a conveyance of land is that it is only when the grant is made according to a plan, distinctly and certainly designated by the deed, that the plan becomes a part of the deed, and in such case it is subject to no other explanations than other parts of the deed.

This principle of construction was followed by this court in Thrasher v. Royster, 187 Ala. 350, 65 So. 796, where it was further held that "where one map or plat is referred to, and thus becomes a part of the conveyance, parol evidence cannot be received to show that another map or plat, not referred to in the instrument, was the map or plat intended," referring to 13 Cyc. 634, and Chesley v. Holmes, 40 Me. 546. The text of 13 Cyc. 634, based upon Chesley v. Holmes, is:

"But a plan only becomes a part of the deed where the grant is made according to such plan distinctly and certainly designated by the deed, and where a certain plan is so designated another plan cannot be referred to."

There is no effort to bring the "Knox Map" into the deeds of 1835–36 by parol, but the effort is to incorporate the "Knox Map" for the reason that the "Dexter Map," which is incorporated by distinct and certain reference, itself contains some inscriptions which may very reasonably be accepted as going to show that the maker got his material from the "Knox Map." The reference thus relied on is a reference shown, not by the deeds, but by a map to which the deeds refer. In my opinion the only reasonable interpretation of the deeds of that date is that, by referring to the "Dexter Map," the trustees intended to be bound by that map only, and that, had they intended to be bound by the implications of the "Knox Map," they would have referred to the "Knox Map." I can see no other rational construction of the deeds and maps in evidence, for, if this process of binding by reference can be carried back beyond the reference of the deed or deeds under which parties claim, it must be allowed to operate through an indefinite series of maps and as often as the map maker sees fit to acknowledge the source from which he gets any part of the information which he puts into his work. The industry of counsel has found no authority for the devolution of property rights by this method; a somewhat extensive search has enabled us to find no such authority; and we feel justified in assuming the agreement of all cases with what seems to be the clear reason of the matter.

There are indications that the original "Dean Knox Map" had acquired some notoriety in the early "40's"; that about that time the municipal authorities of the city of Mobile purchased a copy of it from Dean Knox, the lines of which as to separate parcels—each parcel consisting in general of a city block or square—were reproduced in a later volume of maps covering the city of Mobile (1845) prepared for the city by its engineer, Troost; that the sheriff of Mobile county may have had in mind, though there is no recital in his deed showing the fact, the original "Dean Knox Map" when, in 1842, he executed a deed to one Lyon after a sale for taxes of the right, title, and interest of the trustees in and to "the balance of the Orange Grove tract remaining unsold," and that in 1844 it found its way into the records of the probate court, at whose instance or by what authority does not appear; but none of these facts, nor all of them in combination, show sales by the proprietors or their trustees with reference to the "Dean Knox Map" of the "Orange Grove tract," nor are they sufficient evidence, nor indeed any evidence, of a divestiture by dedication of the property rights of the proprietors, for they were not the acts of the proprietors nor their trustees. It is also true that John Bloodgood, one of the original 10 or 12 proprietors, may have undertaken in 1855 to convey to one Griffin two certain lots on Hunt street by reference to "the Orange Grove tract as laid off and map made for the proprietors by D. Knox"; but the futility of this as an act of dedication is shown by the fact that the legal title at that time was in the trustees, nor does it appear ever to have revested in any part in the grantor, that Bloodgood owned an equity in a one-twelfth interest only in the tract, so that he had not the power to dedicate for his co-owners, and that his alleged deed was executed by M. H. Bloodgood whose power of attorney does not appear.

[3, 4] The conclusion that no dedication of the area in controversy is shown by the evidential facts thus far stated rests upon these well and abundantly settled principles of law viz.: the act of dedication is in the nature of a conveyance of title and interest in land, it can only be made by the owner, and the burden of proving it, including the ownership of the dedicator, rests upon the party asserting the dedication. Johnson v. Common Council of Dadeville, 127 Ala. 249, 28 So. 700; West End v. Eaves, 152 Ala. 339, 44 So. 588; Burleson v. Hamilton (Ala. Sup.) 104 So. 253;[1] 18 C. J. p. 43, § 16. And this in particular it seems necessary to note:

"Proof of dedication by inference from acts of mapping and platting land, and selling lots by reference to the map, is insufficient, unless the sales are shown to have been effectuated by conveyances. * * * The mere act of mapping, platting, and selling, not followed by conveyances or public use of the land, will not prove dedication." 18 C. J. 61.

To quote the language of the New Jersey Supreme Court in Vanatta v. Jones, 42 N. J. Law, 563:

"The owner of lands may map and lay them out into streets and avenues and blocks, at his own free will, and the public will acquire no interest therein until, by some decisive and irrevocable act, either toward the public or toward a grantee, he renders it improper and unjust to permit him to deny the public use and character of the highway."

[5] True, also, that by a decree of the chancery court at Mobile, rendered in 1858 in a

---

[1] Ante, p. 198.

cause between Adams, Smith, and others, complainants, v. McCoy, Norris, and Magee, trustees named in the deed of trust of 1835, to which we have referred, it was ordered that so much of the lands conveyed by the deed of 1835 as had not been disposed of at the sales in 1835–36 "be sold [by the trustees, two of whom had been replaced by the court] in city lots or squares, to be laid off in conformity with the plan adopted at the sales of 1835 and 1836"; but to this direction of the decree cannot be assigned the effect of declaring a dedication by the sales in 1835–36. It would be a matter of some difficulty to interpret "plan" in this decree to mean "plat" according to the "Dean Knox Map," and yet without such interpretation it sheds no light whatever, competent or incompetent, upon the question at issue. The plan of 1835–36 involved elements other than a platting of the area then in part disposed of, and the purpose of the decree was to authorize and direct the disposition of an area largely in excess of that set apart for sale in 1835–36 and in excess of the territory comprised within the "Orange Grove tract" shown by the "Dean Knox Map." The record in the cause in which the decree of 1858 was rendered is persuasive that there was a plan according to which the sales of 1835–36 were conducted, and it may be conceded there was a plat as a part of the plan, but, before the reference to a plan in the decree can take on any significance in that peculiar connection, it must first be known what was the plat according to which the previous sales had been made, and that, so far as appears from the evidence in this cause, was merely a plat of the territory south of Hunt street. And, apart from the considerations mentioned, the decree cannot be given the interpretation suggested for the reason that, so interpreted, it would lie wholly without the field of the issues in the cause in which it was rendered. Hence our conclusion that the decree of 1858 adds nothing to the contention for a dedication prior to its date.

[6] As for the sales made in express pursuance of the decree of 1858, we feel constrained by the facts in evidence to hold that they, also, are ineffectual as constituting a dedication to public use of the area to which reference has been made as the "Marmotte wharf." These sales were made by reference to "a plan of a part of the Orange Grove, made and projected by P. J. Pillans, city surveyor, at the instance of said parties of the first part [the trustees] under the direction of the committee [of proprietors] aforesaid, and now [then] of record in Book of Maps No. 1, pages 1 and 2, in the office of the judge of probate of Mobile county," as the recitals of the deeds show. This map, as heretofore mentioned, shows streets, blocks, and areas, including the area hereinbefore designated as "Marmotte wharf," in part identical with the "Dean Knox Map." But it shows a broad swath laid across the tract by condemnation to the use of the Mobile & Ohio Railroad, and a curvature of Royal street (which had previously appeared as running north and south in a straight line) to make it conform to the western margin of the railroad tract. The decree, as we have shown, directed a sale in city lots or squares "to be laid off in conformity with the plan adopted at the sales of 1835 and 1836"; but lodged in the trustees "a discretionary power to cause surveys and plans to be made and streets to be marked out and filled up and graded so as to prepare and to expose the lands for sale to the best advantage." It might well be considered, therefore, that, in general, the "Pillans Map" was a new map made under the above quoted authority of the decree, though in greater part, it may very easily be inferred, its locations and measurements were copied by the draftsman. But, apart from those differences, it departed from the "Dean Knox Map" in one particular which seems to be of great significance in the present connection: It omitted the inscription "Marmotte wharf" which appeared on the "Dean Knox Map" within the lines marking out the area now in dispute.

[7] Such an explicit designation is not always necessary to show a dedication to public use; the intent to dedicate may be inferred from "the relative location of blank spaces and lots or blocks and from the purposes to which the lots or blocks are expected to be devoted." East Birmingham Realty Co. v. Birmingham M. & F. Co., 160 Ala. 461, 49 So. 448; Burleson v. Hamilton, supra. "To show an intent to dedicate a space marked on a plat as a street or alley it is not necessary that the space should be designated as such in express terms. It will be sufficient if upon consideration of the entire plat there is manifested an intent to dedicate the strip as a street or alley. Nevertheless, if all that appears upon the face of the plat is a blank space, and there is nothing to show that the land covered by it has been devoted to a public use, it cannot be held from the face of the plat alone that the owner intended by the recording of the plat to devote the premises represented by the blank space upon the plat to the public use." 18 C. J. p. 61, § 46. If it appears that the reference to streets or alleys shown by a map or plat is for the purpose of description only, there is no dedication. Hoole v. Attorney General, 22 Ala. 197; 18 C. J. p. 61, § 47.

[8] We have taken note of authorities which hold that there is an essential difference between wharves and other public places in respect of the manner of dedication; that a wharf may be either public or private, and its delineation and name on a map have no effect in determining its character. Palen v. Ocean City, 64 N. J. Law, 672, 46 A. 774; 18 C. J. p. 65, § 52. The reason is said to be that "a landing may be public in the sense that it is open to all comers, but wharfage is de-

mandable by some one, and, in order to conclusively indicate that the public is to have a proprietary right, something more than calling the structure a wharf is essential." But, strictly speaking, the essential requisite of a wharf is an artificial construction which facilitates the landing, the loading, and unloading of vessels for water carriage. 28 R. C. L. p. 16. Bayou Marmotte, or One Mile creek, is a water in which the tide ebbs and flows, is navigable for barges and other small vessels, and we would have no difficulty in holding that the area in controversy would have been dedicated to public use as a landing place, as a species of public place, had its designation as "Marmotte wharf" on the "Dean Knox Map" been reproduced on later maps, or had the proprietors at any time made sales of lots by reference to the "Dean Knox Map" without more. As it is, the omission of that designation from the "Pillans Map" appears to be significant as lending support to the notion that the proprietors, if they had ever entertained the intent to dedicate that area to public use, had subsequently come to a different purpose, and this view gathers weight when taken in connection with the fact that in all sales made under authority of the decree of 1858, conveyances of the lots along the water's edge, covering the entire front now in controversy, were made by reference to the lot and block numbers shown on the "Pillans Map," where lot dimensions, no matter from what source taken, in figures which would not locate the lots as lying over and across the so-called wharf, it is true, but nevertheless with additional descriptions of the lots conveyed as "bounded by Marmotte Bayou or One Mile Creek," or as "fronting on the west side of the channel of said bayou or creek," or as "extending to the channel of Bayou Marmotte or One Mile Creek," etc.

The recitals of these deeds are not accurate, their descriptions are confused, and their interpretation not altogether free of difficulty. They are, however, drawn substantially to one model, with the difference that those which convey lots not attingent upon the bayou or the area in controversy contain no reference to it. As we have heretofore pointed out, the sales of 1835–36 were of lots south of Hunt Street—a part of the "Orange Grove tract." By way of showing authority for the sales in 1859, the uniform recital is that the grantors, "trustees of the Orange Grove," did, in virtue of the decree, expose for sale "the portions of the Orange Grove and Lorent plantation [the plantation having been also included in the deed to the trustees] which were not disposed of at the sale thereof in 1835 and 1836 * * * in city lots or squares laid off in conformity with the plan adopted at the said sales of 1835 and 1836 * * * and in squares and lots and of the same dimensions and boundaries as laid down in a plan of a part of the Orange Grove, made and projected by P. J. Pillans, city surveyor, at the instance of said parties of the first part," the trustees aforesaid.

[9, 10] When a deed refers to a plat or map, the plat or map becomes a part of the deed, and the whole is to be construed as writings in general are construed. All marks and lines, must, if possible, be given effect, and ambiguities must, within reasonable limits (Chicago v. Hogberg, 217 Ill. 183, 75 N. E. 542), be construed in favor of the public in cases involving dedication to public use. 18 C. J. 108–110. But in every case of the kind the intention of the owner must be fairly discernible from his acts and declarations (O'Briant v. O'Briant, 160 Ala. 457, 49 So. 317), and, as we have said, a dedication or grant to the public is not to be presumed; it must be proved. And if the acts and declarations of the owner are equivocal they are insufficient to establish a dedication. Florence v. Florence Land Co., 204 Ala. 175, 85 So. 516.

[11] The most pregnant circumstance in favor of the contention for dedication, remaining after a close analysis of the evidence, is the fact that, if there was no dedication, some of the lots along the water front would be left without access from the neighboring streets. In East Birmingham Realty Co. v. Birmingham M. & F. Co., supra, importance was attached to a similar situation as implying dedication, and very properly so; but that circumstance cannot be accepted as conclusive in the present case, because, for one thing, access to a tidewater highway was arranged for all the lots, and—this, when considered in connection with omission of "Marmotte wharf" which had appeared on the "Dean Knox Map," conclusive to the contrary, as we think—because the conveyances which disposed of these lots in terms described them as bounded by or extending to the channel of the bayou or creek, therein departing from the substantial form which appears to have been adopted in the conveyances of the other lots. These lots along the water front were described according to the lot numbers shown by the "Pillans Map," and as being "of the same dimensions and boundaries as laid down" in that map; but further they were described as bounded by the creek or bayou or as extending to the channel thereof.

[12] The rule in such cases is well settled that monuments, whether natural objects or artificial marks, are allowed to dominate courses and distances, "thus, course and distance shall yield to natural and ascertained objects, as a river, a stream, a spring or a marked tree." Doe ex dem. Miller v. Cullum, 4 Ala. 582; Crampton v. Prince, 83 Ala. 250, 3 So. 519, 3 Am. St. Rep. 718; Barker v. Mobile Electric Co., 173 Ala. 36, 55 So. 364. "Where by giving to monuments a controlling influence, absurd consequences would ensue, or where it is obvious that courses and distances furnish the most certain guide to the location

and quantity of the land, the latter should be followed." Doe ex. dem. Miller v. Cullum, supra. But in this cause it appears to us to be impossible to affirm either that absurd consequences would ensue from a ruling to the effect that there was no dedication of the area in dispute or that the figures on the map furnish a more certain guide than the reference to the channel of One Mile Creek.

[13] Our attention is directed to the fact that the trustees, reporting to the court their execution of the decree of 1858, reported the sale of numerous lots according to the "Pillans Map," such sale being held on April 18, 19, 20 and 21, 1859, and being the first sale under that decree, and that the report mentioned sales of some lots remote from the water front, a sale to E. V. George, for example, ahead of the sales of the lots fronting on the creek, and upon this foundation is laid the argument that the sales thus first mentioned in the report antedated the sales of later mention, and so that there had been a dedication of the entire tract then offered for sale by reference to the "Pillans Map," which the trustees, grantors, donors, could not undo or affect by their later sales of the lots along the water front in which later cases they described the lots as bounded by or extending to the channel of the bayou or creek. We are unable to attach any importance to the order in which the sales were mentioned in the report. Possibly the trustees did expose the lots for sale in the order in which they were mentioned. But that sale,—or those sales, as that form of expression be preferred,—though extending through four days, constituted one proceeding under one decree, all the results of which were reported in one report and approved by one decree of the court, thus taking effect at one time. Each of the conveyances is therefore to be construed in connection with all the others. City of Denver v. Pearce, 13 Colo. 383, 22 P. 774, 6 L. R. A. 541; 26 R. C. L. 738. Each must be given full effect according to its specific terms unless in conflict with some other; and, obviously, there is no conflict between the deeds dedicating the streets to the public according to the map and deeds reserving to private ownership lots fronting on the water's edge.

[14, 15] The last suggestion requiring notice is that the true interpretation of the deeds extending the boundaries to One Mile creek is that they conveyed "the fee subject to the easement shown on the 'Pillans Map' as being imposed upon the 'Marmotte wharf' area." * * * In this way the descriptions in this class of deeds can be reconciled, avoiding a conflict in other provisions of the instrument." Upon further consideration we do not find that this suggestion adds to the weight of the case for dedication. The differences in the two descriptions are of no consequence in this cause except as they may or may not affect the ascertainment of the grantors' intent with respect to dedication.

It is clear enough that, as between the grantors and the purchasers, at their sale complete proprietorship passed to the purchasers along the water front unless, by the deeds to them and incumbrance on their purchases, an easement in favor of the public was clearly shown, since, as has appeared, the conveyances of lots remote from the water front had not the effect of dedicating the area in dispute—this, because conveyances of the water front lots were made in terms significantly different from the others. The construction of the water front deeds in favor of the grantees therein, as they must be construed, is that they passed an unincumbered property right.

[16] At the argument some stress was laid on the case of McAlpine v. Chicago, etc., R. Co., 68 Kan. 207, 75 P. 73, 64 L. R. A. 85, 1 Ann. Cas. 452. In so far as that case determines that a strip of land lying along the bank of a river and definitely dedicated to public use as a "levee" does not revert to the dedicators by reason of misuse or nonuse, unless perhaps its use for the dedicated purpose has become impossible, or so highly improbable as to be practically impossible, we find no reason to doubt its authority. Smith v. Opelika, 165 Ala. 630, 51 So. 821. But the question of original dedication vel non was not at issue in that case, and hence it is no authority on the question here which relates exclusively to the subject of the original dedication of the area in dispute—at least that is the only issue we have considered to require discussion. But, while the total neglect by the municipal authorities of the area in question for 60 or 70 years and their acquiescence in the uses which some of the appellees have made of a part of it for a number of decades may not be accepted as evidence of a reversion to the dedicators, in case there was a dedication, these circumstances may no doubt be looked to for what they may be worth, in connection with all others bearing upon the question, in determining the original intent as to dedication and acceptance by the public, which also is necessary to a dedication.

[17] As to parts of Orange, Morgan, and Marion streets lying within section 11 as the same are shown on the "Pillans Map," the trial court decreed that there had been no dedication, for the reason that at the time of the sales in 1859 the title to the area so described was in the government of the United States. A patent to these areas—that is, to the inclusive fractional section 11—was in evidence. This patent, of date October 30, 1879, put the title of the government in James L. Hamilton. This title seems to have passed by quitclaim to J. M. and T. Meaher. Appellees do not connect themselves with this title in J. M. and T. Meaher; but that is of no consequence, for, obviously, there could have been no dedication by private individuals while the title was in the government. Nor was there evidence that title had passed out

of the government prior to the patent to Hamilton; nor do we see that there is any element of estoppel against appellees or any of them to affirm the title in the government prior to its date.

[18] The argument for an estoppel rests in the main upon the proposition that the deed to the trustees and the decree of 1858 purported to pass the title to every inch of the territory in dispute, and, since appellees claim title through conveyances from those trustees under the decree, they are estopped to deny the lawful existence of any easement or public right of way purporting to have been established by those conveyances and that decree. The bill refers to the defendant Alabama Corn Mills as the owner of the property attingent upon these parts of these streets as designated upon the "Pillans Map," and appellee's claim of possession and ownership is not denied. If such owner was party to any conveyance by reference to the plan of streets shown by the map, it would be conceded that they would be estopped to deny such streets in the absence of some such express qualification as affected the titles to lots on the margin of the creek. Teasley v. Stanton, 136 Ala. 641, 33 So. 823, 96 Am. St. Rep. 88. But the record does not show the origin of this appellee's title. For aught appearing it may have traced its title back to the government. It does not appear that this appellee or its predecessors in title purchased at the sale in 1859. There was no estoppel against the government, of course; nor does any fact appear to estop this appellee, whether it succeeded to the title of the government or not, from showing that there was no dedication of these parts of streets just here in question, for the very good reason that at the time of the alleged dedication the title to the property was in the government of the United States. It is not contended that anything has occurred since the date of the patent to change the status of right and title then created.

It results that the decree rendered in the trial court must in all respects be affirmed.

Affirmed.

ANDERSON, C. J., and SOMERVILLE, MILLER, and BOULDIN, JJ., concur.

GARDNER and THOMAS, JJ., dissent.