† CHESLEY *versus* HOLMES.

A deed describing the land conveyed therein by *numbers* and *range*, *according to the new survey*, will not authorize the use of a *plan*, proved to have been made according to what was called the new survey, to establish the *extent* of the lots so conveyed.

Where the limits of the premises by *numbers only* are thus left *uncertain*, reference must be had to other parts of the deed to determine them.

Chesley *v.* Holmes.

And where, in such a deed, reference is had to the *farm* occupied by the grantor, that is the more certain description, and will determine the extent of the *lots* conveyed.

ON REPORT from *Nisi Prius*, SHEPLEY, C. J. presiding.

WRIT OF ENTRY, to recover possession of lots numbered 3 and 4, in the first range, according to the new survey, in the town of Oxford.

The tenant pleaded the general issue, and filed a brief statement of title in himself and in the heirs of Jacob Dwinal.

The demandant, through Jairus S. Keith, claimed title from the administrator of Samuel Brown, deceased.

And the question was, whether Brown, at the time of his death, was seized of the premises.

The following diagram, in connection with the evidence, will show more distinctly the nature of plaintiff's claims:—

Poland line, originally North 45° East, — now 48°.

The above sketch or plan was used at the trial, certified by David Noyes, on Dec. 1, 1854, as "the plan of the above lots in the first and second range of lots in the third division of lots in Hebron, a part of which is now Oxford, and is a true copy this day taken from the old original plan, now in possession of William C. Whitney."

"N. B. Lots No. 5, in the first and second ranges, are northwest of the Samuel Brown farm, and were once owned by Jacob B. Brown."

In the demandant's deed of quitclaim, from Jairus S. Keith, of Dec. 1, 1851, was this description: —

"One parcel of land situated in said town, called and known as lot numbered four, in the first range of lots in said town, and also another parcel lying aside the first described parcel, called and known as lot numbered three, in said first range, and those two parcels of land, being two jib lots, lying between lots numbered three and four, in the second range, and the pigeon hill lots in said town; for further reference they may be found described on the new survey and plan of Alexander Greenwood, as above set forth."

The deed from the administrator of *Samuel Brown*, to said Keith, contained the same description.

William C. Whitney testified, that Alexander Greenwood was directed to have the lands surveyed, and that his was called the new survey, and that a plan introduced of the premises, bearing his signature, was genuine.

Samuel Brown had a warrantee deed of lot No. 3, in 2d range, according to the new survey, in 1825, and a bond of No. 4, in 1826. There was evidence tending to show that he lived on these lots 25 or 30 years; that he would not take a deed of lot No. 4, as the bond did not embrace all the land he bargained for, and that he called a part of his land the back lot, which included all from Pigeon hill lots to Hogan pond, and that he bargained for the lot. His house was on the eastern side of the range line, marked on the diagram, and he occupied and improved them as his home-

stead; and there was no evidence of any line, or the range line, in fact.

On Jan. 22, 1838, *Samuel* Brown conveyed, by deed of warranty, to Leonard, John and Cyrus Brown, as follows:

" Two lots of land, situated in said Oxford, being lots numbered 3 and 4, in the second range, according to the new survey of lots in said town of Oxford," one-half to Leonard, and a quarter to each of the remaining grantees.

He also, on July 11, following, executed another warrantee deed to the same Leonard Brown, of " one undivided half of lots No. 3 and 4, in the second range, in said town of Oxford, according to the new survey, being the farm now occupied by said Samuel Brown, in Oxford."

The title acquired by Leonard, John and Cyrus, by these conveyances, was held by the tenant and others in common, with whom the demandant had no connection.

Upon so much of the testimony as was admissible, the Court were authorized to draw inferences as a jury might, and enter judgment by nonsuit or default.

*Bartlett,* for demandant, in the opening argument, maintained, that the title of Samuel Brown was by possession or disseizin. How that was obtained, he cited *Little* v. *Libbey,* 2 Maine, 247. That when a grant of land is made with reference to a plan actually made at the time, if it can be ascertained, it is to govern, according to *Heaton & al.* v. *Hodges,* 14 Maine, 66.

He also argued, that definite boundaries will limit the generality of a term previously used, as " my homestead farm, being lot No. 13, in range 4," was construed to convey only the lot, although the grantor occupied land adjoining the lot. *Allen* v. *Allen,* 14 Maine, 387; *Allen* v. *Littlefield,* 7 Maine, 220; *Thorndike* v. *Richards,* 13 Maine, 430; *Lyman* v. *Clark,* 9 Maine, 238; *Child* v. *Hickett,* 4 Maine, 471.

By the principle in *Allen* v. *Allen,* the tenant is limited to lots 3 and 4, in the 2d range. The definite boundaries limit. No mention is made in the deeds of lots 3 and 4, in the first range, by Samuel or any of his grantees.

He also maintained, that according to the evidence Samuel Brown always kept up a distinction in the ranges, and that of these jib lots he kept and maintained a quiet and peaceable possession of them until his death, and that no claim was ever made to those numbers in range one until after Samuel's death.

*May,* for tenant.

To enable the administrator to convey, Brown must have died seized in fee simple or in fee tail, general or special, of the premises, or he must have fraudulently conveyed them or been colorably disseized with intent to defraud his creditors, R. S., c. 112, § 31, otherwise nothing passed by the administrator's deed.

He also argued, from the evidence reported, that Samuel Brown held his homestead, not by disseizin, but, so much of it as was not embraced in the deed to him, by contract with the owner and in subordination to such title. That if the jib lots, so called, were not in reality a part of lots No. 3 and 4, 2d range, then his occupation would not constitute a disseizin, and would not give any title to the jib lots to said Samuel Brown, but the same would remain, notwithstanding his occupation, in the original owners, and they might lawfully convey it as they have undertaken to do. *Brown* v. *Gay,* 3 Greenl. 126; *Lincoln* v. *Edgecomb,* 31 Maine, 345. And that at no time did Samuel Brown have any legal title to the premises demanded either by deed or disseizin. But again, if he had any title whatever to those jib lots, so called, he parted with it before his death. The lots 3 and 4 were claimed to extend to Pigeon hill, and by new survey did reach that line.

The deeds he gave are not objected to as being in fraud of Samuel's creditors. According to the case of *Abbott* v. *Pike,* 33 Maine, 204, the word farm being more certain than the No., controls the description, and thus passes his title to his farm.

The objection made, that the tenant does not own the whole but only a fourth part, if any, is of no avail, if it ap-

pears that the demandant has no right there. It is upon the strength of his own title he must prevail, if at all.

*Perry*, in reply.

The title to lots No. 3 and 4, in the 2d range, is not in issue. The testimony in the case shows, that Samuel Brown acquired title to jib lots 3 and 4, in the first range, by disseizin, as maintained by my associate in the opening argument. This position is controverted, but neither the testimony nor the arguments used in defence are successful.

The case of *Dwinal* v. *Holmes* settles nothing in relation to No. 4, in the 1st range, and the whole argument of the Court, when applied to the last mentioned lot, entirely fails. The counsel for tenant labors to prove, from the declarations of Samuel Brown, that he held in subordination to the title of the Cragie heirs, but I contend, that all declarations of Brown which tend to contradict any sealed written instrument are legally inadmissible. The contract only related to that in the 2d range, and is the only evidence as to what the parties agreed to.

Again, random declarations carelessly made and imperfectly remembered, should always be received with great caution, especially when they contradict written contracts, and the deliberate acts of the parties making them.

There is no evidence in the case tending to show, that 4 in the 1st range was intended to be included in the bond. The counsel on the other side carefully avoids any allusion to the acts of Brown to show what he understood about it. What were his acts?

He went into possession of lot No. 4, first range, in 1811 or 12; that subsequently one or two other persons were there exercising acts of ownership, and in 1815 Samuel Brown purchased of Isaac Estes his betterments. This was ten years before the trade with the Cragie heirs for lot No. 4, 2d range. He also agreed to sell a part of lot No. 4, 1st range, in 1815 or 16, and the person with whom the contract was made went into possession of the same and remained two years.

Here was adverse possession, ten years before the trade for No. 4, in the second range. Douglass sold back to Brown, and he continued in possession thereof. These acts show no subordination to the Cragie heirs.

When Brown took the bond, he did nothing to recognize any right of the Cragie heirs to No. 4, in the first range. This bond was made of No. 4, in the second range, when it was perfectly well known that there was, by the survey, the same number of the first range, which fact shows that they only claimed title in range 2.

As to the other jib lot, the testimony shows that Samuel went into possession of it as far back as 1804, and built a house upon it, and the deed from Whitney to Brown, of 3, in second range, is dated in 1825. And the fact that he cut timber on this lot after the conveyance to his sons, of lot 3, in 2d range, shows that he never understood that it belonged to that lot.

These acts were notice of an adverse claim. *Alden* v. *Gilmore*, 13 Maine, 178; *Poignard* v. *Smith*, 6 Pick. 172; *School District No.* 4, *in Winthrop*, v. *Benson*, 31 Maine, 381.

All the acts of Brown show his possession in the premises to have been adverse, as well as open, notorious and exclusive.

Having established, as I trust, the title of Samuel Brown, to jib lots 3 and 4, in the first range, did he die seized of them? Does the tenant show any title to the premises? If any, it is by the deed of Samuel Brown to Leonard, John and Cyrus, of Jan. 22, 1838. This deed conveyed nothing but 3 and 4, in second range.

The deed of Samuel Brown to Leonard, of one-half of 3 and 4, was dated July 11, 1838.

It is a matter of no sort of consequence, so far as this case is concerned, whether the old gentleman, in this last deed, conveyed one lot or two, as the tenant does not pretend to claim any thing under it.

In *Abbott* v. *Pike*, 33 Maine, 204, the deed described

the land as being "lot No. 3, the same farm that Peter Wyman now lives on." The question was not, whether lot 3 extended over the whole farm; it is not at all analagous to the case. The facts found, the "farm to be on lot one, instead of three. The question was, whether the word "farm," as occupied by a certain person, was a more certain description than the number of a lot upon which said person never lived. This case does not, in any particular, overrule the case of *Allen* v. *Allen,* 14 Maine, 387; and the Court will so find by examining the two cases.

The plan put into the case as the new survey, as sworn to by Whitney, shows that 3 and 4 in the 2d range, did not extend to the Pigeon hill lots. This I put in against the bare assertion of Bro. May to the contrary, unsustained by a single particle of proof.

The case, as drawn up by the Chief Justice, finds no deed put in from John Brown to David Dunn, and yet one has been smuggled in by the tenant. This not having been put into the case, will not be considered by the Court.

This puts an end to the title of the tenant, as claiming any thing under Samuel Brown.

But supposing this deed was in the case, it does not help the matter any for the tenant, for the copy smuggled in, conveys only "$\frac{1}{4}$ of 3 and 4 in the second range, and the same conveyed by Samuel Brown, Jan. 22, 1838."

Then the deed from Dunn to tenant describes the land "$\frac{1}{4}$ of lots 3 and 4, being the same conveyed by the said Samuel Brown in Jan., 1838, and by him, since that time, conveyed to me."

If the tenant has any title under Samuel Brown, it is clearly to only $\frac{1}{4}$ of 3 and 4, in the second range. To contend for any thing more, is to argue against the express words in the deed making the grant.

There is no evidence, that the heirs of Cragie ever had any title to the demanded premises.

If the tenant has title to any part of the Samuel Brown farm, it is only to $\frac{1}{4}$ of lots 3 and 4 in the 2d range. These

the plaintiff does not claim. The demandant having shown, as we think, the title in the premises in Samuel Brown at the time of his decease, is entitled to judgment.

TENNEY, J. — The demandant derives her title to the premises demanded by a deed dated Dec. 1, 1851, from Jairus S. Keith, who received a deed from Moses Chesley, administrator of the goods and estate of Samuel Brown, deceased, on the same day. The administrator appears to have been duly licensed to make sale of the real estate of the intestate, and no defect in the proceedings is pointed out by the tenant. And it remains to be shown on the part of the demandant, that the premises described in the deed to her from Keith, were the property of the intestate at the time of his death. This she attempts to do by the proof of such facts as constituted a disseizin of the true owner and so long continued as to ripen into an absolute title in him.

The tenant denies, that a title was obtained by disseizin, by the intestate. But if it were so, he undertakes to show that he was divested of all interest before his death by a conveyance to his sons, by deeds, with covenants of warranty. One of those deeds is dated Jan. 22, 1838, and conveys to his sons Leonard, John and Cyrus, two lots of land situated in Oxford, being lots numbered 3 and 4, in the 2d range, according to the new survey of lots in that town, to Leonard one half and to each of the other two grantees one quarter, in common and undivided.

On July 11, 1838, the same grantor conveyed to Leonard Brown one undivided half of lots numbered 3 and 4, in the second range, in the town of Oxford, according to the new survey, being the farm now occupied by said Samuel Brown in Oxford.

The cause of the second deed to Leonard Brown is not attempted to be explained. It may have been, that he wished to possess exclusively, the deed of the land conveyed to him. A second deed is sometimes given, embracing a de-

scription of the land conveyed by a former with additional estate. If the latter was the intention in this case, the mode adopted does not seem well adapted to effect the purpose; for the description by the lots, and ranges in one, is identical with that of the other. And if it were the intention to embrace other lands in the second conveyance, a deed thereof alone, would be more appropriate. But we think by a reasonable construction, the design was to convey not only the land intended to be conveyed by the first deed, by the second, but to make the description more definite, and unambiguous.

The conveyances made by Leonard Brown to Jacob Dwinel, one dated September 19, 1840, and the other Feb'y 10, 1844, each of an undivided quarter of lots numbered 3 and 4, in the second range in the town of Oxford, show that he put upon the deeds of Samuel Brown, a similar construction to the one adopted by us, one deed being one fourth part of those lots, "according to the new survey, it being one quarter of said lot, where Samuel Brown lives in Oxford," and the other, "according to the new survey, being the farm now occupied by Samuel Brown in said Oxford."

The tenant denies, that it is established, that the conveyances of Samuel Brown to his sons were of lots numbered 3 and 4, in the second range, according to the plan, which according to the testimony of William C. Whitney was introduced at the trial. Whitney testified, that the name of "Alexander Greenwood" upon a plan shown, was the handwriting of Greenwood; that directions were given him, to have the lands surveyed, and they were; and that survey was called the new survey. But whether that plan was that of the new survey or some other, does not appear. The sketch of a plan taken by Noyes is not shown to have been copied from Greenwood's plan of his new survey; but the certificate thereon is, that it is a true copy of the old original plan, now in the possession of William C. Whitney.

But if it were made to appear clearly, that the plan exhibited at the trial was that made by Greenwood, when he was directed to make the survey, which probably was the

fact; and that the sketch was taken therefrom, which makes a part of the case, this plan, according to well established principles, cannot be treated as having any influence upon the decision of this case; because it is not referred to in the deeds of Samuel Brown to his sons, as part of the description.

It is only when the grant is made according to a plan, distinctly and certainly designated by the deed, that the plan becomes a part of the deed, and in such case it is subject to no other explanations, than other parts of the deed.  *Pro. Ken. Purchase* v. *Tiffany,* 1 Greenl. 219.

In the deeds of Samuel Brown, no reference is made to any plan, or to the survey of Greenwood, or any other person.  It is of lots numbered 3 and 4, second range, according to the new survey.  This is certainly not a distinct and certain designation of a plan, or of a survey, and the plan introduced at the trial makes no part of the deeds of Samuel Brown.

We must, therefore, understand those lots which are mentioned in the deeds, as those, which composed the farm, occupied by Samuel Brown in the town of Oxford, at the time, when those deeds were dated.  The case is not analagous to that of *Allen* v. *Allen,* relied upon by the demandant, in which no question was made touching the plan referred to in the deed; but it is more like that of *Worthington* v. *Hylyer,* 4 Mass. 196, and of *Abbott* v. *Pike,* 33 Maine, 204.  It is true, that in those cases, the farm intended to be conveyed, as the Court held, in each case, was not in any part of it, on the lot referred to.  In this case, no plan being a part of the description in Brown's deeds, the location of the lots, No. 3, and No. 4, in the range 1, is uncertain, excepting so far as they are made so by what follows.

The farm occupied by Samuel Brown in the year 1838, is shown very clearly to have extended from the line of the Pigeon hill lots to Hogan pond; and that there was no intermediate line.  He lived upon land, which is easterly of the line on the plan introduced, representing the range line be-

tween the ranges, 1 and 2, from the time he moved into the town, which was about 1804, till his death in 1845. No evidence is introduced having a tendency to prove, that the farm on which he always lived in the town of Oxford did not extend to the line of the Pigeon hill lots. And it having been his intention, according to a proper construction of his deeds, to extend the boundaries to that line, he had no title to the premises described in the demandant's writ at the time of his death; and nothing passed by the deed of the administrator of his estate. *Demandant nonsuit.*