MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2016 ME 35
Docket:      Kno-14-437
Argued:      June 18, 2015
Decided:     February 25, 2016

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

BEVERLY A. GRAVISON et al.

v.

CALVERT M. FISHER et al.

JABAR, J.

[¶1]    This matter, like the matter of *Edwards v. Blackman*, 2015 ME 165, --- A.3d ---, concerns property rights in certain oceanfront lots located in the Coopers Beach neighborhood in Owls Head.  In this matter, Beverly and David Gravison appeal from a judgment entered by the Superior Court (Knox County, *Hjelm, J.*) denying the Gravisons' complaint for deed reformation.  Joined by Darlene and Lewis Edwards, the Gravisons also challenge the court's declaration that certain neighboring property owners hold easements that permit recreational use of the beach located in front of the Edwardses' and the Gravisons' property.  The Gravisons and the Edwardses additionally appeal, and Sandra Titcomb, Trustee of the Arthur Titcomb Living Trust (Titcomb) cross-appeals, from the court's declaration that certain neighboring property owners hold easements in a perimeter path located on the properties owned by the Gravisons,

2

Titcomb, and the Edwardses. By cross-appeal, the neighboring property owners challenge the court's ruling regarding the beneficiaries and scope of the easements over the perimeter path.

[¶2] We affirm the denial of the Gravisons' complaint for deed reformation, and affirm the court's decision on all issues pertaining to the perimeter path. As to the beach easements, we affirm in part and vacate in part.

## I. BACKGROUND

[¶3] Unless otherwise indicated, the following facts are drawn from the trial court's judgment and post-judgment order, and are supported by the record.

A. The Properties at Issue

[¶4] The Gravisons own an oceanfront lot located in the Coopers Beach neighborhood in Owls Head. Their lot is next to an oceanfront lot owned by Titcomb, which is next to an oceanfront lot owned by the Edwardses. The beach in front of the Gravisons' lot is the subject of the reformation dispute. The dispute over the perimeter path concerns a strip of land that is located near, but does not touch, the high-water mark in front of the properties owned by the Gravisons, Titcomb, and the Edwardses. The beach easement dispute concerns the intertidal area in front of the lots owned by the Gravisons, Titcomb, and the Edwardses.

[¶5] Mary-Lou Moulton owns an oceanfront lot located near the Edwardses' property. Separated from the shorefront by the oceanfront properties lie inland lots

owned by Calvert and Wendy Fisher, David and Theresa Massimi, Kenneth Roy and Barbara Watrous, Nancy Ellen Wolff Bolan, Douglas and Leah Johnson, Anne Long, Jean Perkins, Nina Paul, and Michele Lawrence. These individuals and Moulton (collectively, the neighboring property owners) assert the easements at issue in this case.

[¶6]   A map admitted as an exhibit at trial labels and depicts the configuration of most of the parties' properties. We include a copy of that map below.



4

B.    The Blackinton Plan

[¶7]  To address the easements in the oceanfront lots, it is necessary to trace the chains of title back to June of 1882, when A.D. Blackinton drew up a plan for the subdivision of a tract of land located in the Coopers Beach neighborhood (the Blackinton Plan).  The tract depicted on that plan (the Perry Parcel) was owned first by Eliza Perry, and then by her daughter, Cora Perry.  Eliza and Cora are the common grantors, in whole or in part, of all of the properties owned by the parties to this action.

[¶8]  The Blackinton Plan was recorded on November 5, 1924.  The plan was altered in the period between its creation in 1882 and recording in 1924, as demonstrated by notations on the recorded plan of events that occurred after 1882. The recorded plan shows several formal ways with boundaries marked by straight, solid lines of uniform width.  It also shows a way (the perimeter path) that runs along the shoreline perimeter of the land now owned by the Gravisons, Titcomb, and the Edwardses.  The recorded plan does not indicate whether the perimeter path was a component of the original plan.  The recorded plan marks the boundaries of the perimeter path by a set of curved, dashed lines of non-uniform width, in a manner that is qualitatively different from the plan's portrayal of other bounded ways.  As shown on the recorded plan the perimeter path does not at any point touch the high-water mark.

[¶9]  At some point, the Edwardses' house was constructed, with a portion of the house encroaching on the perimeter path.  There is no evidence that anyone objected to that construction based upon an asserted interest in the perimeter path.  Despite the placement of the Edwardses' house on part of the perimeter path, individuals who do not own the land covered by the perimeter path have made at least occasional use of the land that lies in the approximate location of the perimeter path as it is shown on the plan.

[¶10]  A copy of the Blackinton Plan was admitted as an exhibit at trial. We reproduce that copy here.



6

## C.    The Parties' Source Deeds[1]

[¶11]    Before the Blackinton Plan was recorded in 1924, Eliza and Cora conveyed out of the Perry Parcel the lots that now comprise the properties owned by the Fishers, the Johnsons, and Moulton (collectively, the pre-record owners). The properties now owned by the Massimis, Roy and Watrous, Bolan, Long, Perkins, Paul, and Lawrence (collectively, the post-record owners) were conveyed out of the Perry Parcel, in whole or in part, after the plan's recording.[2]

[¶12]    The following facts regarding the language of the parties' source deeds are drawn from the deeds summarized by Exhibit 211, which was entered in evidence as a demonstrative aid and relied upon by the parties and the court. All of the neighboring property owners derive title through source deeds that refer to (1) the "plan of Cooper's Beach as laid out in June 1882"; (2) the "plan of said Coopers Beach as laid out in June 1882"; or (3) the "plan of Coopers Beach made by A.D. Blackin[]ton, Surveyor, dated June, 1882."

[¶13]    Based on the contents of Exhibit 211 and the deeds to which that exhibit refers, the trial court found that the pre-record source deeds convey the

---

[1]  In this action, the parties used the phrase "source deeds" to refer to the originating deeds by which the Perrys first conveyed their lots with metes and bounds descriptions. We adopt that referent herein.

[2]  As explained *infra*, the temporal relationship between the recording of the Blackinton Plan and the origination of the neighboring property owners' source deeds affects our analysis of the neighboring property owners' easement claims. We therefore refer to those whose source deeds pre-date the recording of the plan as the "pre-record owners" and refer to those whose source deeds post-date the recording of the plan as the "post-record owners."

"privilege" or "privileges of all streets laid out on said Plan," while the post-record source deeds convey "rights of way" shown on the plan.

[¶14]  The trial court also found that a majority of the neighboring property owners derive title through source deeds that grant "use of the beach for boating and bathing purposes."  As demonstrated by the deeds in the record, this finding holds true for all of the neighboring property owners except Bolan and Lawrence.  Instead of "beach" rights, the source deeds for the properties held by these individuals grant "all riparian rights and shore privileges of every nature."

[¶15]  Neither the plan nor the parties' source deeds identify the location of the "beach" or the area subject to "riparian rights and shore privileges."  When the Perrys first conveyed "beach" rights, they owned the intertidal area in front of the properties that are now owned by the Gravisons, Titcomb, and the Edwardses.

D.    Farber's Will and the Deeds of Distribution

[¶16]  Resolving the Gravisons' deed reformation claim necessitates an examination of the will of their predecessor, Charles Farber, and a deed of distribution from Farber's estate.  In the 1990s, Farber owned an oceanfront lot numbered 63 on the property maps for the Town of Owls Head that included an intertidal area. [3]  In 1991, Farber executed a will that devised to the

---

[3]  Both before and after trial, the parties affirmatively and consistently asserted that Farber owned the intertidal area.  His ownership of this area was not contested.

Camden-Rockport Land Trust, now known as the Coastal Mountains Land Trust (CMLT), "that portion of my real property at Coopers Beach, Owls Head, Maine, that is known as Lot 63." The devise to CMLT did not exclude the intertidal area in front of lot 63. Farber's will devised the remainder of his Owls Head real estate to his second cousin, Bolan. Farber wanted Bolan to participate significantly in his legacy, but he did not give her all of his Owls Head real estate because he wanted to realize the tax benefits of a charitable devise, and he was concerned that Bolan lacked the means to pay taxes on all of his property.

[¶17] In 1998, Robert Coon, as personal representative of Farber's estate, executed the devise to CMLT by way of a deed of distribution. Coon was an experienced transactional attorney and executed the deed in consultation with local counsel. The deed to CMLT conveyed an area that corresponded to lot 63, but used a description that located the seaward boundary of that lot at the "high water mark," excluding the intertidal area from the conveyance.

[¶18] The Gravisons now own the property that was deeded to CMLT. By virtue of the remainder clause in Farber's will, Bolan received title to all of Farber's land in Owls Head that was not deeded to CMLT, including the intertidal area in front of the Gravisons' property. For Bolan, that intertidal area is landlocked because she cannot access it without crossing property owned by others or navigating there over water.

E.      Procedural History

[¶19]   In December of 2011, the Gravisons filed a complaint against the neighboring property owners, requesting a declaratory judgment establishing that the neighbors "have no right to use or go onto any portion of the Gravisons' property or beach." [4]   The neighboring property owners counterclaimed, demanding, inter alia, a declaratory judgment confirming the existence of deeded easements over the Gravisons' property.[5]  Bolan also demanded a declaratory judgment confirming her title to the intertidal zone abutting the Gravisons' property.  By "interlineated amended complaint," the Gravisons then complained against Bolan, seeking to reform the deed from Farber's estate to CMLT to include the intertidal zone, and alleging that the parties to that deed had operated under a mutual mistake of fact as to the deed's property description.

[¶20]   The neighboring property owners moved to consolidate the *Gravison* case with the *Edwards* case, which was also pending before the Superior Court,

---

[4]   The Gravisons' initial complaint named as defendants the Fishers, the Massimis, Roy and Watrous, Bolan, Long, Perkins, Moulton, Paul, and Douglas Johnson as Trustee of The Osprey Realty Trust. While the action was pending, the Osprey Trust conveyed its property to Douglas and Leah Johnson.  The Johnsons then moved to substitute themselves for the Osprey Trust.  Lawrence was later joined as a fourth-party defendant to the Gravisons' and the Edwardses' joint complaint for the same declaratory relief as the Gravisons had requested in their initial complaint.

[5]   Although Lawrence did not affirmatively assert any deeded easement claims, the parties advanced and defended the neighboring property owners' deeded easement claims as though Lawrence had affirmatively advanced them too.  In other words, the parties did not attempt to distinguish Lawrence from the other neighboring property owners based on the formal state of the pleadings.  Under these circumstances, the trial court appropriately considered Lawrence's procedural posture as equivalent to the procedural posture of the other neighboring owners. *See* M.R. Civ. P. 15(b).

asserting that the actions presented a common legal issue—namely, the interpretation of the Blackinton Plan and the deeds that referred to it. Following the denial of that motion, the neighboring property owners, other than Long,[6] amended their counterclaim to join Titcomb and the Edwardses as counterclaim defendants. The Edwardses, who shared counsel with the Gravisons, then counterclaimed against the neighboring property owners, seeking, inter alia, the same declaratory relief that the Gravisons had sought in their initial complaint. Separately represented, Titcomb denied the neighboring property owners' counterclaim assertions without affirmatively advancing any claims on its own behalf.

[¶21] Before trial, Bolan moved to exclude any extrinsic evidence of Farber's intent, arguing that such evidence was inadmissible on the Gravisons' deed reformation claim because the deed from Farber's estate to CMLT was unambiguous. In response, the Gravisons argued that extrinsic evidence of Farber's intent was admissible because the deed to CMLT did not reflect Farber's intent. The court denied Bolan's motion in limine and agreed with the Gravisons' contention that extrinsic evidence is admissible in a reformation action.

---

[6] Before the neighboring property owners amended their counterclaim, Long shared counsel with the Fishers, the Massimis, Roy and Watrous, Bolan, the Johnsons, Perkins, Moulton, and Paul. In July of 2012, Long entered an appearance on her own behalf.

[¶22]   By agreement of the parties, the entire transcript generated in the *Edwards* case was entered in evidence in this case.

[¶23]   After a five-day bench trial, the court entered a judgment denying the Gravisons' reformation claim.  The court concluded that the properties held by the post-record owners, but not the pre-record owners, benefit from deeded easements over the perimeter path located on the properties owned by the Gravisons, Titcomb, and the Edwardses.  The court further concluded that the easements over the perimeter path had been abandoned in the area covered by the Edwardses' home, and that the easements do not allow access to the beach.  As to the beach easement dispute, the court concluded that all of the neighboring property owners have deeded easements that permit use of the intertidal areas owned by Bolan, Titcomb, and the Edwardses "for reasonable recreational purposes that are conventionally associated with that type of area."

[¶24]   The Gravisons, the Edwardses, and the neighboring property owners, other than Long, moved for further findings and amended conclusions.  The court then entered an order concluding that the grantees of the post-record deeds acquired easements over the perimeter path, as shown on the recorded plan, at the time of the post-record conveyances "by operation of law and irrespective of who owned the servient estate at the times of those conveyances."  The court clarified that the neighboring property owners could access the beach by using the road near

12

Moulton's property. It declared that the deeded "riparian rights and shore privileges" held by Lawrence were coextensive with the deeded rights to "use of the beach for bathing and boating" held by other neighboring property owners. It also confirmed that the neighboring property owners' deeded rights over the "beach" and "shore" referred to the intertidal area, reasoning that the parties had used this definition of the "beach" at trial, and that it was the definition of the "beach" that existed at the time that the Perrys granted the beach and shore rights at issue.

[¶25] The Gravisons and the Edwardses appealed, and Titcomb and the neighboring property owners cross-appealed.

## II.  DISCUSSION

A.    The Gravisons' Claim for Deed Reformation

[¶26] The trial court found that, "irrespective of the intention" of CMLT, the Gravisons had "failed to prove by clear and convincing evidence that the [deed from Farber's estate to CMLT] was affected by a mutual mistake." The Gravisons challenge this finding, asserting that Farber's will unambiguously instructed the personal representatives of his estate to convey all of lot 63 to CMLT, that Coon intended to effect Farber's testamentary plan to include the beach in the conveyance to CMLT, and that the deed to CMLT mistakenly excluded the beach. The Gravisons argue that the court erred by excluding some portions of Coon's

testimony regarding Farber's testamentary intent, and by assigning more weight to Bolan's testimony that Farber intended to leave her the beach than to Coon's testimony that he mistakenly excluded the beach from the conveyance. We discern no reversible error in the court's evidentiary decisions pertaining to the Gravisons' claim for deed reformation and conclude that the court was not compelled by the evidence to grant that claim.

1.    Extrinsic Evidence

[¶27]    Before trial, the Gravisons argued that the court should admit evidence extrinsic to CMLT's deed in order to determine Farber's testamentary intent. After the court entered an order that agreed with that contention, the Gravisons submitted significant evidence extrinsic to the deed, including Farber's will and Coon's deposition testimony regarding Farber's testamentary plan. Bolan also presented her own testimony that Farber told her that he intended to leave her the intertidal area. The court considered this testimony in reaching its decision with regard to the Gravisons' claim that the deed should be reformed, and the Gravisons now argue that the trial court erred by admitting any evidence of Farber's intent extrinsic to his unambiguous will.

[¶28]  The Gravisons did not object to the admission of Bolan's testimony at trial. Because they object to that evidence for the first time on appeal, we apply the obvious error standard of review, considering whether the admission of Bolan's

14

testimony constituted "a seriously prejudicial error tending to produce a manifest injustice." *See Kondaur Capital Corp. v. Hankins*, 2011 ME 82, ¶ 15, 25 A.3d 960 (quotation marks omitted).

[¶29]  In determining whether the deed of distribution to CMLT failed to convey the property intended, the court did not err, let alone obviously err, by considering evidence extrinsic to Farber's will.  "It has long been the law in Maine that in an equitable action to reform a deed parol testimony is admissible to prove mutual mistake."  *Sargent v. Coolidge*, 433 A.2d 738, 740 n.3 (Me. 1981) (emphasis omitted).  In this action to reform the deed to CMLT, the court was neither confined to the language of the deed nor the language of Farber's will. The will, like the testimony of Bolan and Coon, was admitted for the purpose of showing the intent of the parties who executed the deed.  It was the deed, not the will, that conveyed property to CMLT without the adjacent beach, and it was the deed that was the subject of the reformation action.

2.    Mistake

[¶30]  "Reformation is an equitable remedy by which an instrument may be corrected when a mistake is discovered so as to reflect the real intention of the parties." *Jordan v. Shea*, 2002 ME 36, ¶ 18, 791 A.2d 116.  To secure reformation based upon mistake, a party must prove by clear and convincing evidence that the parties to the deed labored under a mutual mistake of fact regarding a term of the

written instrument, such as the location or description of the property. *Baillargeon v. Estate of Daigle*, 2010 ME 127, ¶ 16, 8 A.3d 709; *Gunzinger v. C & G Estates, Inc.*, 610 A.2d 735, 737 (Me. 1992).

[¶31]  Whether the parties to a deed were mistaken is a question of fact, reviewed only for clear error. *Jordan*, 2002 ME 36, ¶ 20, 791 A.2d 116. "In an appeal from a trial court's factual finding when the burden of proof is clear and convincing evidence, we look to whether the factfinder reasonably could have been persuaded that the required factual finding was or was not proved to be highly probable." *Baillargeon*, 2010 ME 127, ¶ 16, 8 A.3d 709 (quotation marks omitted).  When the appellant had the burden of proof at trial, we will overturn a finding that the appellant failed to prove facts that would support the elements of his or her claim only if the appellant can "demonstrate that a contrary finding is compelled by the evidence." *St. Louis v. Wilkinson Law Offices, P.C.*, 2012 ME 116, ¶ 16, 55 A.3d 443.

[¶32]  Here, the court appropriately allowed the parties to present evidence extrinsic to both the will and the deed in order to have a sufficient basis upon which to determine whether the deed should be reformed.  The court also committed no error in determining that some portions of Coon's deposition testimony were inadmissible and refusing to consider those portions in its decision.

[¶33] Coon's testimony could have supported a finding that he mistakenly omitted the beach from the deed's property description and consequently failed to carry out Farber's intent to include the intertidal area in the conveyance to CMLT. However, the court determined that Coon's execution of a deed that clearly omitted the beach, given his experience and assistance by local counsel, undercut the value of his testimony that he failed to carry out Farber's intent. The court also gave "material weight" to Bolan's testimony that Farber told her that he would leave CMLT the upland portion of lot 63 and leave her the beach.

[¶34] The strength of the Gravisons' reformation claim depends upon the credibility of Coon and Bolan as witnesses. "That credibility was for the trial court to assess," and "[w]e defer to the court's assessment of that credibility." *Bartlett v. Lindahl*, 560 A.2d 563, 565 (Me. 1989). On the conflicting evidence in this record, the trial court was not compelled to find to a high degree of probability that there was a mutual mistake in the deed from Farber's estate to CMLT. *See Estate of Fournier*, 2009 ME 17, ¶ 14, 966 A.2d 885 ("That there is contrary evidence that would support a different result is not, without more, a basis for vacating the trial court's factual findings."). Although that deed effectively orphans the beach in front of the Gravisons' property, we discern no reversible error in the trial court's determination that the Gravisons failed to carry the burden of proof on their reformation claim.

B.     Easements in the Perimeter Path

[¶35]   At trial, the neighboring property owners claimed that they held deeded easements over a path located near the shorefront perimeter of the properties owned by the Gravisons, Titcomb, and the Edwardses.  The bases of these rights, they claimed, were the references in their source deeds to the Blackinton Plan.

[¶36]  In adjudicating the neighboring property owners' easement claims to the perimeter path, the trial court distinguished between the pre-record owners, whose pre-1924 source deeds grant use of the "streets laid out" on the Blackinton Plan "as laid out in June 1882," and the post-record owners, whose post-1924 source deeds grant "rights of way shown" shown on the Blackinton Plan "dated June, 1882."  The court concluded that the pre-record source deeds could not "be construed to create record rights to the use of the perimeter path" because those deeds incorporated the original plan, and the pre-record owners had failed to prove that the perimeter path was depicted on the original plan.  The court determined that the post-record source deeds incorporated the recorded plan, and construed the dotted lines shown near the shorefront perimeter on the recorded plan as a "way" within the meaning of the post-record deeds' grant of "rights of way."   It accordingly concluded that the post-record owners benefit from easements over a perimeter path located on the properties owned by the Gravisons,

Titcomb, and the Edwardses. The court further determined that the easements over the perimeter path had been abandoned in the area covered by the Edwardses' home, and that the easements do not allow access to the beach.

[¶37] Before examining the trial court's conclusions as to the existence and scope of the easements over the perimeter path, we review the principles that govern the interpretation of the deeds at issue. When a deed conveys property by reference to a plan depicting lots, streets, and ways, the deed gives rise to an implied easement in those streets and ways, appurtenant to the property conveyed by reference to the plan. *See D'Alessandro v. Town of Harpswell*, 2012 ME 89, ¶ 6, 48 A.3d 786. Under these circumstances, easement rights are implied to secure to the grantee and subsequent purchasers of property shown on the plan "those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out on the plan indicated." *Arnold v. Boulay*, 147 Me. 116, 121, 83 A.2d 574 (1951) (quotation marks omitted).

[¶38] When a deed distinctly refers to a plan, the plan is incorporated into the deed by that reference. *Sleeper v. Loring*, 2013 ME 112, ¶ 13, 83 A.3d 769; *Chesley v. Holmes*, 40 Me. 536, 546 (1855). The plan is then interpreted pursuant to the same rules that govern the construction of the deed. *Chesley*, 40 Me. at 546.

[¶39] "The first step in any analysis of the language in a deed is to give words their general and ordinary meaning to see if they create any ambiguity.

If the words create no doubt, the deed is clear and unambiguous," and it will guide the court's construction of the parties' intent. *Green v. Lawrence*, 2005 ME 90, ¶ 7, 877 A.2d 1079 (quotation marks omitted). The court may consider extrinsic evidence in determining the parties' intent only if the deed's language is ambiguous. *Id.* The construction of a deed and incorporated plan, including the determination of whether these documents are ambiguous, is ordinarily a question of law that we review de novo. *See Testa's, Inc. v. Coopersmith*, 2014 ME 137, ¶ 11, 105 A.3d 1037. However, if a deed and plan are ambiguous, their interpretation is a question of fact that we review only for clear error. *See id.*

### 1. Construction of the Pre-Record Owners' Source Deeds

[¶40] The source deeds to the properties held by the Johnsons, the Fishers, and Moulton (the pre-record owners) unambiguously convey rights in the "streets laid out" on the "plan of Cooper's Beach as laid out in June 1882," thus incorporating by distinct reference the Blackinton Plan as it appeared in June of 1882. The language of these deeds could have created easements over the perimeter path only if that path was a street laid out on the original Blackinton Plan. Because the original Blackinton Plan was not in evidence at trial, the meaning of Cora's pre-record conveyance of rights in the "streets laid out" on the plan "dated June 1882," cannot be determined as a matter of law. Notwithstanding their contentions to the contrary, the pre-record owners bore the burden of proof on

all factual issues pertaining to their claim, including proving that the Blackinton Plan depicted the perimeter path in June of 1882. *See LaBelle v. Blake*, 1998 ME 165, ¶ 9 n.3, 714 A.2d 145. The record does not compel a result contrary to the court's finding that the pre-record owners failed to carry this burden.

[¶41] No evidence in the record establishes the contents of the original plan. Markings on the recorded plan entered in evidence plainly demonstrate that the plan was altered in the period between its creation in 1882 and its recording in 1924, and the trial court found that the differences between the recorded plan's depiction of the perimeter path and its depiction of other ways called the evolution of the perimeter path into "considerable dispute." Given the lack of evidence as to which features of the recorded plan were also features of the original plan, we affirm the finding that the pre-record owners failed to carry their burden of proof, and affirm the conclusion that the pre-record owners do not hold easements in the perimeter path. *See Amodeo v. Francis*, 681 A.2d 462, 466 (Me. 1996).

2.      Construction of the Post-Record Owners' Source Deeds

[¶42] The record establishes that the Massimis, Roy and Watrous, Bolan, Long, Perkins, Lawrence, and Paul (the post-record owners) derive title, at least in part, through a common 1934 source deed from Cora Perry to V.F. Studley (Studley's deed) that conveyed "all rights of way shown on plan of Coopers Beach made by A.D. Blackin[]ton, Surveyor, dated June, 1882." Before examining

Studley's deed, we first address the argument, made by Titcomb and the Edwardses, that Cora lacked the capacity to encumber their properties by way of Studley's deed because she conveyed their properties before she executed Studley's deed.[7] This contention rests upon the fundamental proposition of law that a grantor can encumber property only while he or she owns it. *See Warchalowski v. Brown*, 417 A.2d 425, 428 (Me. 1980).

[¶43]  The record demonstrates that Cora conveyed the property now owned by Titcomb by way of two deeds, one executed in 1929 and the other in 1930, and that she conveyed the property now owned by the Edwardses through three deeds, all executed in 1927.  The earliest of the Edwardses' source deeds (McKusick's deed) was granted by Cora to Evelyn McKusick on August 2, 1927, and described the property conveyed as follows:

> [A] certain lot or parcel of land at Cooper's Beach, Owls Head, Maine, being one of the cottage lots indicated but not numbered on plan of Cooper's Beach dated June 1882 by Blackin[]ton, surveyor (Knox Registry, Book 3, Page 81) and being the northern most of a tier of lots lying westerly of a 30 feet right of way and opposite lots 19 to 24 inclusive; this lot being more specifically bounded as follows:
>
> Beginning at a point in the westerly line of the 30 foot right of way above referred to, said point being 253.7 feet northerly from the north-east corner of W.R. Lufkin's cottage lot; thence westerly at a right angle to said line of right of way seventy-five (75) feet; thence northerly, parallel to the line of right of way, ninety (90) feet more or less to the southerly line of right of way along the shore; thence

---

[7]  The Gravisons, who derive title through Studley's deed, do not join in this argument.

southeasterly and southerly by said right of way to place of beginning. Together with[]all rights of way appurtenant thereto.

[¶44]  Construing the foregoing language de novo, as a matter of law, we have no difficulty concluding that McKusick's deed conveyed property by distinct reference to the recorded Blackinton Plan and therefore incorporated that plan into the deed.  In view of the plan's depiction of numbered lots, ways of access, and a way running along the shore, we also have no difficulty concluding that McKusick's deed gave rise to an implied easement over the perimeter path, appurtenant to the property shown on the plan of development.[8]

[¶45]  Cora thus created an implied easement over the perimeter path, for the benefit of the property shown on the plan, as early as August 2, 1927, when she executed McKusick's deed.  This occurred before Cora executed the remaining source deeds to the properties now owned by Titcomb and the Edwardses.

[¶46]  Having concluded that Cora effectively burdened the perimeter path located on the properties owned by Titcomb and the Edwardses, we now consider whether she effectively granted benefits in that path as appurtenances of the

---

[8]  In 1878, we explained that

> [w]hen the owner of land . . . divides it into streets and building lots, and makes a plan of the land thus divided, and then sells one or more of the lots, by reference to the plan, he thereby annexes *to each lot sold* a right of way in the streets, which neither he nor his successors in title can afterwards interrupt or destroy.

*Bartlett v. Bangor*, 67 Me. 460, 464-65 (1878) (emphasis added).

properties held by the post-record owners. For this purpose, we consider the following provision of Studley's deed: "Conveying also all rights of way shown on plan of Coopers Beach made by A.D. Blackin[]ton, Surveyor, dated June, 1882[.]" Our analysis, informed by the parties' contentions, concerns three issues: First, whether Studley's deed incorporated the recorded plan; second, whether Cora effectively annexed to Studley's land appurtenant benefits over the perimeter path; and third, whether the perimeter path allows access to the beach.

[¶47] In construing Studley's deed, the first issue is whether that deed incorporated the recorded plan. The trial court found that Cora's post-record conveyances, which include Studley's deed, incorporated "the plan as it was recorded rather than as it appeared on some earlier date," based upon the inference that Cora was involved in, or had actual or constructive notice of, the plan's recording. The record evidence supports this finding. The language of McKusick's deed establishes that Cora knew where the Blackinton Plan was located in the registry in 1927. From this it follows that she had this same knowledge and referred to the recorded plan when she executed Studley's deed in 1934. We therefore affirm the trial court's determination that the post-record owners derive title through a deed that refers to the recorded plan.

[¶48] The second issue in the interpretation of Studley's deed concerns the meaning of that deed's grant of "rights of way." Considering that grant de novo, in

light of the dotted lines of the perimeter path and the solid lines of the other access ways shown on the recorded Blackinton Plan, we conclude that the meaning of the grant of "all rights of way" in Studley's deed is ambiguous. To resolve this ambiguity, the trial court considered the difference between the pre-record deeds' conveyance of an easement over the "streets laid out on [the] plan" and the post-record deeds' conveyance of an easement over the "rights of way shown on [the] plan." Comparing the dotted lines of the perimeter path with the plan's more formal depiction of other access ways, the court found that the perimeter path was a "right of way" granted "for purposes that appear to be recreational and that are tied to the appeal of the land, which is its proximity to the water." This interpretation of the perimeter path as a "right of way" within the meaning of Studley's deed is consistent with Cora's reference to a "right of way along the shore" in McKusick's deed. We therefore affirm the trial court's conclusion that when Cora executed Studley's deed and referred to the recorded plan therein, she effectively annexed to Studley's property "all rights of way" shown on the recorded plan, including rights in the perimeter path.

[¶49] Having concluded that Cora created easements over the perimeter path benefiting the properties held by the post-record owners, we now consider the third issue in the interpretation of Studley's deed—whether the trial court erred in determining the easements' scope. In adjudicating the scope of the easements over

the perimeter path, the trial court ruled that the dominant owners could not cross over the servient owners' land located between the path's seaward boundary and the high-water mark in order to access the beach. The neighboring property owners argue that the recreational nature of the perimeter path easements and the path's close proximity to the high-water mark both indicate that the easements include the incidental right to access the beach. Construing the Blackinton Plan's depiction of the perimeter path as a matter of law, we affirm the trial court's declaration regarding the easements' geographic scope. Because the conveyances of the perimeter path easements are explicitly delimited by the path's boundaries as shown on the plan, and the path's seaward boundary at no point abuts the high-water mark, the dominant owners are entitled to use only the land within those boundaries, and may not use their path easements to access the beach. *See Rotch v. Livingston*, 91 Me. 461, 472, 40 A. 426 (1898) ("[T]he grantees of a right of way of a specified width have an easement in the way to the . . . extent of its dimensions."); *cf. Arnold*, 147 Me. at 117-19, 83 A.2d 574 (concluding that a road allowed access to the lake shore when a development plan established the shorefront line of numbered lots eighty feet from the shore and designated the area in between that shorefront line and the high-water mark of the lake as "Lake Shore Road").

26

### 3. Whether the Perimeter Path Easements have been Terminated

[¶50]   An easement can be terminated in multiple ways, including (1) through acquisition of the servient estate by a bona fide purchaser who lacks notice of the encumbrance, and (2) by an act or omission of the dominant owner evidencing a clear intent to abandon the easement. *Stickney v. City of Saco*, 2001 ME 69, ¶ 42, 770 A.2d 592. On appeal, the parties who own the land covered by the perimeter path assert that the easements over that path were terminated by acquisition of the servient property for value and without notice, and by abandonment. Titcomb and the Edwardses advance the lack of notice issue;[9] the Gravisons and the Edwardses advance the abandonment issue.

[¶51]   Neither Titcomb nor the Edwardses made any arguments regarding termination of the easements for lack of notice in their pre- or post-trial pleadings. The parties failed to present the notice issue to the trial court for decision and consequently failed to preserve the issue for appeal. *See Davis v. Picciandra*, 662 A.2d 898, 899 (Me. 1995). We therefore confine our discussion to the argument advanced by the Gravisons and the Edwardses—both at trial and on appeal—that the easements over the perimeter path have been terminated in their entirety by abandonment.

---

[9]   The Edwardses' extend their lack of notice contentions to the easements over the perimeter path and the beach. Our conclusion with respect to this issue applies equally to both encumbrances.

[¶52] The party asserting abandonment of an easement has the burden of proving either "1) a history of nonuse coupled with an act or omission evincing a clear intent to abandon, or 2) adverse possession by the servient estate." *Canadian Nat'l Ry. v. Sprague*, 609 A.2d 1175, 1179 (Me. 1992). The proponent of abandonment must prove these elements by clear and convincing evidence, establishing each fact to a high degree of probability. *Stickney*, 2001 ME 69, ¶ 51, 770 A.2d 592. For the purposes of the act or omission variant of abandonment at issue here, the necessary intent to abandon may be demonstrated only by an unequivocal act or failure to act that is "decisive and conclusive" and "inconsistent with the further assertion of rights associated with the existence of the easement." *Canadian Nat'l Ry.*, 609 A.2d at 1179 (quotation marks omitted). An easement holder's intent to abandon may be inferred from a "failure to object to the erection of a permanent structure that prevents the enjoyment of the rights granted by the easement." *Chase v. Eastman*, 563 A.2d 1099, 1102 (Me. 1989). However, if a structure obstructs only part of an easement and the easement holder continues using other unobstructed parts of the easement, failure to object to the structure may support a finding that the easement holder only abandoned the part of the easement that the structure obstructs. *See id.* at 1102-03.

[¶53] Here, the court found no evidence that anyone objected to the construction of the Edwardses' home on part of the perimeter path, and concluded

that this failure to object constituted abandonment as to that part of the perimeter path. The court also found that "there has been at least occasional use of the land that is located approximately where the path is shown on the Blackinton Plan," and concluded that the easements over the perimeter path consequently "remain in effect except for the portion of the path where the Edwardses' house is located."

[¶54] Contrary to the contentions of the Gravisons and the Edwardses, the court's finding regarding use of the perimeter path is amply supported by the evidence that the neighboring property owners presented at trial. The record establishes that the Edwardses' predecessors constructed a cottage that obstructs part of the perimeter path approximately seventy years ago, and later, in the late 1970s, attached an addition to that cottage that also obstructed part of the perimeter path located on the Edwardses' property. Despite this construction, use of the perimeter path has continued in the areas of the path that remain unobstructed. On these facts, the trial court was not compelled to find that the easement holders' failure to object to the Edwardses' construction resulted in a complete abandonment of the easements over the perimeter path. *See Chase*, 563 A.2d at 1102-03. We therefore affirm the trial court's determination that the easements over the perimeter path have been abandoned to the extent that the path is covered by the Edwardses' home, and the easements otherwise remain in effect.

C.    Easements in the Beach

[¶55]    In reviewing the trial court's ruling regarding the neighboring property owners' easements in the beach, we consider (1) whether the neighboring property owners' source deeds gave rise to easements in the beach, and if so, whether the encumbered beach area includes the intertidal area owned by the Edwardses;[10] and (2) whether the trial court erred in declaring that the dominant estate holders have the right to use the beach "for reasonable recreational purposes that are conventionally associated with that type of area."

1.    Creation and Location of the Beach Easements

[¶56]    With the exception of Bolan and Lawrence, each of the neighboring property owners derives title through source deeds that expressly grant "use of the beach for boating and bathing purposes."  Bolan and Lawrence derive title through a common source deed that instead expressly grants "all riparian rights and shore privileges of every nature."  All of the neighboring property owners' source deeds

---

[10]  Because the Gravisons do not own the beach in front of their property, they have no standing to contest the trial court's conclusion that the neighboring property owners hold easements over that beach. *See Chase v. Eastman*, 563 A.2d 1099, 1103 n.6 (Me. 1989) ("In order to have standing to [contest] a claim . . . a party must assert a personal stake in the outcome of the litigation and present a real and substantial controversy touching on the legal relations of parties with adverse legal interests.") (alteration omitted) (quotation marks omitted).  Though Titcomb could have contested the court's determination regarding the beach easements, it focused solely on defending against the easements over the perimeter path.  We consequently address only the beach easement issues raised by the Edwardses, and confine our analysis of rights in the beach to the intertidal area that the Edwardses own.

that convey beach rights or shore privileges refer, in some fashion, to the Blackinton Plan.

[¶57]  In *Edwards*, we discussed the effect of Cora's express annexation of appurtenant benefits to an inland lot owned by the Scotts—who are not parties here—by way of a 1924 deed that referred to the Blackinton Plan and conveyed rights to "use of the beach for bathing and boating purposes."  2015 ME 165, ¶¶ 39-41, --- A.3d ---.  In interpreting that deed, we determined that Cora had incorporated the plan for the purpose of designating the location of the beach. *Id.* ¶ 40.  "When construed in conjunction with the plan's unrestricted depiction of an intertidal area," we concluded that the meaning of the deed's reference to "the beach" was obviously "to grant rights in the intertidal area depicted on the plan." *Id.* ¶ 41.  Because the record demonstrated that the Edwardses' beach was shown on the plan, and that Cora owned the Edwardses' beach in 1924, we affirmed the court's conclusion that the beach rights granted by the 1924 deed encumbered the Edwardses' intertidal area.  *Id.* ¶¶ 40-41.

[¶58]  Pursuant to the same analysis as that employed in *Edwards*, we conclude that the Edwardses' intertidal area is encumbered by easements that benefit all of the neighboring property owners other than Bolan and Lawrence. The record demonstrates that all of the neighboring property owners derive title through source deeds that refer to the Blackinton Plan and expressly grant beach

rights or shore privileges. All of the neighboring property owners other than Bolan and Lawrence also derive title through source deeds that contain the foregoing plan reference and express grant and were executed before 1927, when Cora conveyed title to the intertidal area that is now owned by the Edwardses.

[¶59] As demonstrated by the deeds in their respective chains of title, Bolan and Lawrence both claim deeded "riparian rights and shore privileges" solely through Cora's 1934 source deed to Studley, discussed *supra*. Studley's deed was executed after Cora conveyed title to the Edwardses' intertidal area in 1927 and thereby divested herself of the ability to create new easements over that area. *See Dorman v. Bates Mfg. Co.*, 82 Me. 438, 448, 19 A. 915 (1890) ("One can not convey land, nor create an easement in it, unless he owns it."). Because Cora lacked the ability to create a new express easement over the Edwardses' beach after she sold it in 1927, Studley did not acquire any rights in that beach through his deed in 1934. Bolan and Lawrence, who derive deeded shore rights through the Perrys solely by way of Studley, do not hold any rights in the Edwardses' beach.

[¶60] All of the other neighboring property owners derive title through source deeds that grant beach rights and were executed before Cora conveyed the beach that is now owned by the Edwardses. Like the deed at issue in *Edwards*, the deeds at issue here refer to the Blackinton Plan for the purpose of locating

easements in the beach. 2015 ME 165, ¶ 40, --- A.3d ---. The Edwardses' beach is included in the intertidal area shown on the Blackinton Plan. We therefore conclude that the neighboring property owners, other than Bolan and Lawrence, benefit from easements over the Edwardses' beach.

2.     Activities Permitted by the Beach Easements

[¶61]  The trial court construed the neighboring property owners' rights to "use of the beach for boating and bathing" "to convey an intention to use the beach for reasonable recreational purposes that are conventionally associated with that type of area." The court made this determination as a matter of law, and was not called upon to consider the factual question of what specific activities would be incidental to the rights expressly granted. *See N. Sebago Shores, LLC v. Mazzaglia*, 2007 ME 81, ¶ 17, 926 A.2d 728. The court instead considered, as a matter of law, the evident recreational purposes of the development shown by the plan, and construed the beach rights granted by reference to that plan to include the rights to engage in reasonable recreational activities that are typically engaged in on a beach.

[¶62]  The Blackinton Plan indicates that the Perry Parcel was divided into "cottage lots," and shows numbered lots located near the Rockland Harbor. The deeds granting "use of the beach for bathing and boating purposes" refer to the plan. Construing de novo the language of the deed clauses granting rights in the

beach, in light of the plan to which the deeds refer, we conclude that Cora intended to convey to her grantees the right to use the beach for recreational activities reasonably related to bathing and boating. *See Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 6, 910 A.2d 392 (indicating that "the holder of an easement may only exercise the rights granted in a reasonable manner"). To the extent that limitation was not clear from the trial court's judgment, we clarify the judgment to reflect that the neighbors' beach rights are limited to recreational activities that are reasonably related to bathing and boating.[11]

The entry is:

> Judgment vacated to the extent that it declares Bolan and Lawrence the holders of deeded easements over the Edwardses' intertidal area. Judgment clarified to reflect that the neighbors' beach rights are limited to recreational activities reasonably related to bathing and boating. In all other respects, judgment affirmed.

**On the briefs:**

David A. Soley, Esq., and Glenn Israel, Esq., Bernstein Shur, Portland, for appellants Beverly A. Gravison, David B. Gravison, Darlene F. Edwards, and Lewis M. Edwards III

---

[11] The issue of the *specific* recreational activities that are reasonably related to bathing and boating is a question of fact that the parties did not raise until after trial. *See N. Sebago Shores, LLC v. Mazzaglia*, 2007 ME 81, ¶ 17, 926 A.2d 728. Any factual dispute regarding what recreational activities are reasonably related to bathing and boating may, in future, require further adjudication. *See id.*

Andrew W. Sparks, Esq., and Michael T. Devine, Esq., Drummond & Drummond, LLP, Portland, for cross-appellant Ellwood Arthur Titcomb Living Trust

Paul F. Driscoll, Esq., and David A. Goldman, Esq., Norman Hanson & DeTroy, LLC, Portland, for cross-appellants Calvert M. Fisher, Wendy B. Fisher, David A. Massimi, Theresa M. Massimi, Kenneth C. Roy, Barbara J. Watrous, Douglas E. Johnson, Leah Johnson, Nina Paul, Jean Perkins, Mary-Lou M. Moulton, and Michele E. Lawrence

Judy A.S. Metcalf, Esq., and Ryan P. Dumais, Esq., Eaton Peabody, Brunswick, for cross-appellant Nancy Ellen Wolff Bolan

Anne Long, appellee pro se

**At oral argument:**

David A. Soley, Esq., for appellants Beverly A. Gravison, David B. Gravison, Darlene F. Edwards, and Lewis M. Edwards III

Andrew W. Sparks, Esq., for appellee Ellwood Arthur Titcomb Living Trust

David A. Goldman, Esq., for appellees Calvert M. Fisher, Wendy B. Fisher, David A. Massimi, Theresa M. Massimi, Kenneth C. Roy, Barbara J. Watrous, Douglas E. Johnson, Leah Johnson, Nina Paul, Jean Perkins, Mary-Lou M. Moulton, and Michele E. Lawrence

Judy A.S. Metcalf, Esq., for appellee Nancy Ellen Wolff Bolan

Knox County Superior Court docket number RE-2011-51
FOR CLERK REFERENCE ONLY